DANIEL F. STROTHER, PLAINTIFF IN ERROR V. JOHN B. C. LUCAS, DEFENDANT.

Ejectment for two lots of ground in St. Louis, Missouri. The plaintiff had brought an ejectment, which was before the Court on a writ of error, in 1832, and the judgment in favour of the defendant was affirmed. 6 Peters, 763. He afterwards brought another action of ejectment for the same land. By the Court—Had this case been identical with the former, as to the merits, we should have followed the deliberate opinion delivered therein; but as one judgment in ejectment is not conclusive on the right of either possession or property in the premises in controversy, the plaintiff has a right to bring a new suit; and the court must consider the case, even if it is in all respects identical with the former, though they may hold it to be decided by the opinion therein given. It is otherwise when the second case presents a plaintiff's or defendant's right, on matters of law or fact, material to its decision, not before appearing in the record; it then becomes the duty of the Court to decide all pertinent questions arising on the record, in the same manner as if the case came before them for the first time, save such as arise on evidence identical as to the merits. In this case, we deem it a peculiar duty; enjoined upon us by the nature of the case, the course of the able and learned arguments as to the law of Spain and her colonies, in its bearing on the interesting question before us, together with a view of the consequences of our final decision thereon. Were we to leave any questions undecided which fairly arise on the record; or to decide the cause on points of minor importance only; the value of the premises would justify future litigation; which no court of chancery might think proper to enjoin so long as new and material facts could be developed, or pertinent points of law remain unsettled.

The state of Missouri was formerly a part of the territory, first of France, next of Spain, then of France, who ceded it to the United States by the treaty of 1803, in full propriety, sovereignty and dominion, as she had acquired and held it; 2 Peters, 301, &c.: by which this government put itself in place of the former sovereigns, and became invested with all their rights, subject to their concomitant obligations to the inhabitants. Both were regulated by the law of nations, according to which the rights of property are protected, even in the case of a conquered country; and held sacred and inviolable when it is ceded by treaty, with or without any stipulation to such effect; and the laws, whether in writing, or evidenced by the usage and customs of the conquered or ceded country, continue in force until altered by the new sovereign.

This Court has also uniformly held that the term "grant," in a treaty, comprehends not only those which are made in form, but also any concession, warrant, order or permission to survey, possess or settle, whether evidenced by writing or parol, or presumed from possession; and that in the term "laws," is included custom and usage, when once settled; though it may be "comparatively of recent date, and is not one of those to the contrary of which the memory of man runneth not, which contributed so much to make up the common law code, which is so justly venerated."

No principle can be better established by the authority of this Court, than "that the

[Strother v. Lucas.]

acts of an officer, to whom a public. duty is assigned by his king, within the sphere of that duty, are prima facia taken to be within his power." "The principles on which it rests, are believed to be too deeply founded in law and reason, ever to be successfully assailed. He who would controvert a. grant executed by the lawful authority, with all the solemnities required by law, takes on himself the burthen of showing that the officer has transcended the powers conferred upon him; or that the transaction is tainted with fraud."

Where the act of an officer to pass the title to land according to the Spanish law, is done contrary to the written order of the king, produced at the trial, without any explanation, it shall be presumed that the power has not been exceeded; that the act was done on the motives set out therein; and according to some order known to the king and his officers, though not to his subjects: and courts ought to require very full proof, that he had transcended his powers, before they so determine it."

Even in cases of conquest, the conqueror does no more than displace the sovereign, and assume dominion over the country. " A cession of territory is never understood to be a cession of the property of the inhabitants. The king cedes only that which belongs to him; lands he had previously granted, were not his to cede. Neither party could so understand the treaty. Neither party could consider itself as attempting a wrong to individuals, condemned by the whole civilized world. ' The cession of a territory' should necessarily be understood to pass the sovereignty only, and not to interfere with private property." No construction of a treaty, which would impair that security to private property, which the laws and usages of nations would without express stipulation have conferred, would seem to be admissible further than its positive words require. " Without it, the title of individuals would remain as valid under the new government, as they were under the old; and those titles, at least so far as they were consummate, might be asserted in the courts of the United States, independently of this article."

The laws of Spain as to the disposition of the royal domain in Louisiana, while Louisiana was held by Spain.

In the treaty of cession of Louisiana no exceptions were made, and this Court has declared that none can thereafter be made. 8 Peters, 463. The United States must remain content with that which contented them at the transfer, when they assumed the precise position of the king of Spain. The United States have so remained, as appears by their laws. By the acts of 1804, 1805, 1807, and 1816, they recognised the laws, usages, and customs of Spain to be legitimate sources of titles; and, by the act of 1812, confirmed to the inhabitants of St. Louis, and other villages, according to their several right or rights of common thereto, the rights, titles, and claims to town or village lots, out lots, common field lots, and commons, in, belonging or adjoining to the same, which titles depended on parol grants and local customs. The same recognition extended to grants to actual settlers, pursuant to such laws, usages and customs; to acts done by such settlers to obtain a grant of lands actually settled, or persons claiming title thereto, if the settlement was made before the 20th December, 1803.

The unwritten law of Louisiana, before the cession of the territory to the United States.

In favour of long possession and ancient appropriation, every thing which was done shall be presumed to have been rightfully done; and though it does not appear to have been done, the law will presume that whatever was necessary has been done.

A grant may be made by a law, as well as a patent pursuant to a law; and a con-

[Strother v. Lucas.]

firmation by a law, is as fully to all intents and purposes a grant, as if it contained in terms a grant *de novo*.

The acts of the commissioners appointed to adjust and settle land titles in Louisiana, under the acts of congress authorizing and confirming the same, are conclusive as to all titles to lands, which have been confirmed according to the provisions of the different acts of congress on the subject.

It is inconsistent with all the acts of congress which have organized boards of commissioners for adjusting land titles, the proceedings of the board, and the laws which have confirmed them, that the confirmations of the commissioners shall enure to any other uses, or to any other person, than the person or persons claiming the confirmation: it would defeat the whole object of these laws, and introduce infinite public mischief; were the Court to decide that the confirmations by the commissioners and congress, made expressly to those who claim by derivative titles, did not operate to their own use.

IN error to the district court of the United States for the district of Missouri.

The counsel for the plaintiff in error, exhibited the following statement of the case:—

"This was an action of ejectment brought by Daniel F. Strother, of Kentucky, against Jno. B. C. Lucas, of Missouri, to recover a tract of land particularly described in the declaration, as follows: "Lying and being in the city and county of St. Louis, state of Missouri, containing two arpents in breadth, by forty in depth, or eighty superficial arpents, French measure; one of which arpents by forty was granted to one Rene Kiersereau and his heirs, by the proper authority; and the other, to wit, the northern of said two arpents, was originally granted to one Gamache and his heirs; and which said two arpents by forty are bounded on the north by a forty arpent lot, originally granted to one Louis Bissonet; and on the south by a forty arpent lot, originally granted to one John Baptiste Bequette; and which said two forty arpent lots, so above bounded, have been confirmed by the authority of the congress of the United States to the legal representatives of the said Rene Kiersereau, and Gamache, respectively."

The defendant pleaded the general issue, and the cause was tried at the September term, 1835, when there was a verdict for the defendant, and judgment rendered thereon; to reverse which this writ of error is prosecuted.

By the evidence, it appears that in 1764, the post of St. Louis, in Upper Louisiana, was first established by the French, under M.

Laclede. In May, 1770, the Spaniards, under the treaty of 1762, took possession of St. Louis, and Upper Louisiana. Between the year 1764, and 1772, divers grants of land in Upper Louisiana were made by the French and Spanish authorities, respectively. Amongst those grants were some forty or fifty, containing each from one arpent by forty, to four arpents by forty, located in the prairie immediately west of the then village of St. Louis, and extending some distance north and south of it. These lots extend westward to the uniform depth of forty arpents, being parallelograms whose opposite sides are on the north and south, forty arpents in length; and on the east and west from one arpent to four arpents.

Some time in the year 1772, a survey was made, as above described, of these lots, by Martin Duralde, the authorized surveyor of the post of St. Louis.

About that time a fence was established on the eastern boundary of the above range of lots, which separated them from the village, and what was called the commons; there was no division fence, nor any fence on the western boundary; the lots were contiguous to each other; but each lot was held separately, and cultivated separately, by its proprietor or occupant, who was bound by the regulations of the post, to keep the fence in front of his lot (or of whatever number of lots he occupied,) in good repair.

The surveys so made by Duralde, were entered in a book called the Livre Terrein.

Amongst the lots so surveyed and entered, are the two lots in question, described and bounded as in the declaration in this cause. The surveys so entered, and the grants by virtue of which said surveys were made, were solemnly recognised and affirmed by the Spanish lieutenant governor, Don Pedro Piernas; and by his predecessor, the French commandant, S'Ange de Bellerive.

The entry in the Livre Terrein, No. 2, p. 68, which contains this recognition of said grants and surveys, has been printed by authority of congress, and is to be found in Gales & Seaton's American State Papers, vol. 3, p. 677. In the entry in the Livre Terrein of the survey of Gamache's arpent, the grantee is called "Joseph" Gamache. This was a mistake, as is shown fully by the evidence in the cause. It is conclusively proved that the name of Gamache, the grantee, was John Baptiste Gamache, and that no such man as "Joseph" Gamache, existed at that time in Upper Louisiana.

The defendant admits upon the record, that the grantee, Gamache, was known as well by the name of John Baptiste Gamache, and of Baptiste Gamache, as Joseph Gamache; but the fact, as proved in evidence, is that his name was John Baptiste Gamache, and none other.

Immediately after the grants so made to Kiersereau and Gamache, they took possession of their respective lots, and commenced the cultivation thereof, as acknowledged owners and proprietors, by virtue of said grants and surveys. John Baptiste Gamache continued to occupy and cultivate until about January, 1773, when Louis Chancellier took possession; and Rene Kiersereau until about the year 1780, when the said Louis Chancellier succeeded him in the occupation and cultivation of his lot. Louis Chancellier continued in possession and cultivation of both these lots, claiming the same as proprietor thereof by purchase from the original grantees, until his death, in April, 1785. Previous to his death, on his marriage with Marie Louise Dechamp, a marriage contract was executed between him and said Marie Louise, by which a communaute, (partnership) according to the Spanish law, was enacted between them.

On the death of her husband, the said Louis Chancellier, the widow, by virtue of her rights under the communaute, was in lawful possession of the common property of herself and husband, and, consequently, of the two arpents by forty in question. On the 8th June, 1785, an appraised inventory "of all the property, moveable and moveable, which is ascertained to belong to the said deceased, (Louis Chancellier,) and to his wife, Dona Louise Dechamp," was made in due form of law, by the lieutenant governor, Don Francisco Cruzat.

In this inventory, the two arpents in question are described by their metes and bounds; that is to say, "two arpents and a half of land in the prairie, bounded on the one side by land of Bequette, on the other by land of Mr. Bijou." The names of Bijou, or Louis Bissonet, are admitted and proved to mean the same individual.

On the 11th June, 1785, a petition was presented to the lieutenant governor, by said widow and Charles Tayon, the guardian of the property of the infant son of said Louis Chancellier and Marie Louise, praying that said property "in their possession," should be sold at public sale; and on the same day, in pursuance of said petition, an order of sale was made; and on the day following, to wit, the 12th

June, 1785, the lieutenant governor, Cruzat, proceeded to sell the property described in the inventory, and did actually sell a considerable quantity thereof; and amongst other property, the two arpents described as above, were sold and adjudicated to the said Marie Louise Chancellier, for the sum of one hundred and fifty-five livres.

At the same sale, on the same day, was also sold the slave Fidel, belonging to said estate and described in the inventory, to one Hyacinthe St. Cyr, whose security for the payment of the purchase money, (two thousand one hundred livres,) was August Choteau; the former signing by his mark in the margin of the sale, the latter signing his name in full thereon. The first article sold was said Fidel, and the sixth was the two arpents in question. The sale is declared to have been made at the dwelling of said widow, "in whose possession are all said goods," ("bienes" in Spanish, which means "property" generally). Afterwards, by order of the 14th June, 1785, the sale was suspended for want of competent purchasers, and the balance unsold ordered to be delivered to the widow at the valuation, on condition that she be charged with the same on final partition between her and her son.

On the 8th June, 1786, on petition by the said widow and guardian, a partition was ordered to be made between the widow and said infant; and accordingly an account and partition was made, whereby it appears that said widow was charged with the sum of one hundred and fifty-five livres, being the price of said two arpents by forty, by her purchased at the sale of her husband's property. It appears that the balance coming to the minor, amounting to six thousand three hundred and thirty-four livres, seven sous, six deniers, was duly paid over to his guardian; said Charles Tayon, and the sum of three thousand dollars, (including said lots, valued at one hundred and fifty-five livres,) duly paid to said widow.

This final settlement and partition was made on the 13th day of September, 1787, in pursuance of the decree of the governor general, Don Estaban Miro, bearing date 25th February, 1787, all which is set out at large upon the record.

Thus it appears, that in pursuance of a final decree made by the supreme authority in Louisiana, the widow of Louis Chancellier was declared and adjudged to be the lawful owner and possessor of the said two arpents, bounded as described in the declaration in this cause; and that the judgment of partition and final settlement so made, in

ïavour of said Maria Louisa Chancellier, bears date the 13th day of September, 1787.

In addition to the above proof of the title of Marie Louise Chancellier to said two lots, the plaintiff gave in evidence:—

1st. An authentic deed of exchange between Jno. B. Gamache, and said Louis Chancellier; bearing date 23d January, 1773, acknowledged and executed in presence of Don Pedro Piernas, lieutenant governor of Upper Louisiana; whereby said Jno. B. Gamache, as original grantee of said one by forty arpents, conveys the northern half thereof to said Louis Chancellier, in exchange.

2d. An authentic deed, dated 6th April, 1781, acknowledged in presence of Francisco Cruzat, lieutenant governor of Upper Louisiana, whereby Marie Magdalene Robillard conveying to said Louis Chancellier, one arpent by forty, bounded by Jno. B. Bequette, and by Jno. B. Gamache's arpent, being the same granted to Rene Kiersereau. In this deed is signed the name of Rene Kiersereau, as "assisting witness;" and his name also as a party witness, is mentioned in the body of the deed.

It is in evidence that no other man than the grantee existed in Upper Louisiana of the name of Rene Kiersereau; and that Marie Magdalene Robillard, was the wife of said Rene. Besides this, the signature of said Rene Kiersereau to this deed is duly proved; as is also that of the lieutenant governor to this deed, and also to that of Jno. B. Gamache. It is fully proved that said Rene Kiersereau ceased to occupy or cultivate his lot, from the year 1780; and that Louis Chancellier immediately succeeded him in the possession and cultivation thereof; and, as above stated, remained in possession till his death, in April, 1785.

In September, 1788, the widow of Louis Chancellier intermarried with one Joseph Beauchamp, and removed to St. Charles, about twenty miles from St. Louis, on the left bank of the Missouri river.

Some time after the removal of said Beauchamp and wife to St. Charles, (about 1790,) Hyacinth St. Cyr, the same who purchased the slave Fidel at the sale of Louis Chancellier's property, entered upon the two arpents in question, and commenced the cultivation of the same by permission of said Marie Louise; which permission, according to the testimony of said Marie Louise, was given by her said second husband, Joseph Beauchamp: and according to the testimony of Madame St. Cyr, the widow of said Hyacinth St. Cyr, the

syndic authorized said St. Cyr to occupy and cultivate, and that afterwards her husband had his deeds from Kiersereau and Gamache, as her husband told her.

In 1797 or '98, the eastern and only fence of those forty arpent lots fell down; and they again became a wilderness, unoccupied and uncultivated by any body, until some time in the year 1808, when the defendant took possession of them, and enclosed a part of the eastern end thereof, under a deed of conveyance from Augustus Choteau, the same who signed as security for St. Cyr, on the margin of the record of sale of Chancellier's property, as before stated.

In 1815, under the act of congress of 1812, the above two lots were confirmed to the legal representatives of the original grantees; and in said confirmation, the recorder makes special reference to Livre Terrein, No. 2, pages 11 and 12, in which the surveys in favour of Kiersereau and Gamache are recorded.

In 1816, by act of congress of the 29th April, 1816, sect. 1, the aforesaid confirmations are ratified.

The plaintiff then gave in evidence a deed of conveyance from Augustus Gamache, the survivor of the two sons and heirs of John B. Gamache, of his estate, whatever it might be, in said one by forty arpents granted to his father, John B. Gamache, to Basil Laroque and Marie Louise Laroque his wife. Basil Laroque was the third husband of said Marie Louise, the widow of Louis Chancellier. The plaintiff then gave in evidence deeds of conveyance duly acknowledged from said Basil Laroque and Marie Louise, of the said two by forty arpents to George F. Strother, and a deed from said Strother to plaintiff.

Here the plaintiff closed his case, and the defendant then gave in evidence:

1st. Two deeds, bearing date same day, the 23d October, 1783, the one purporting to be a conveyance by said Rene Kiersereau to said Hyacinth St. Cyr, of the one by forty arpents granted to said Rene Kiersereau; the other purporting to be a deed from " Joseph" Gamache, of the one by forty arpents granted to Gamache; and which deed is signed Batis ⋈ Gamache.

In both those deeds it is recited, that for several years previous to their date said St. Cyr had been in possession, and was then in possession of the lots in question.

The defendant then gave in evidence certain proceedings, dated

in 1801, in the matter of Hyacinth St. Cyr, a bankrupt; by which it appears, that amongst the property sold by the syndic on that occasion, "two arpents of land in the first prairie of St. Louis, near the tower, by forty arpents in depth, bounded on the one side by the widow Bissonet, and on the other by Mr. Hortiz," were adjudicated to Mr. Auguste Choteau for twelve dollars.

The defendant then gave in evidence extracts from the proceedings of the board of commissioners, of which board said defendant was a member; purporting to be a confirmation of said two arpents by forty to Auguste Choteau, as assignee of Hyacinth St. Cyr, assignee of said original grantees.

He also gave in evidence a deed, dated 11th January, 1808, from said Auguste Choteau and wife to said defendant, purporting to convey, in fee, to said defendant, said two arpents by forty; " of which forty arpents have originally been ceded to Rene Kiersereau, and the other forty arpents have been originally ceded to Joseph Gamache, the whole bounded by a tract of land originally conceded to John B. Beguette, and by another tract originally conceded to Louis Bissonet; the whole belonging to us, (the said Choteau and wife,) as having become the purchasers of it at the public sale of the property of Mr. Hyacinth St. Cyr."

The defendant then read to the jury certain extracts from the proceedings of the board of commissioners, of which he was a member; by which it appeared that the said board met at St. Charles on the 3d of August, 1807, and held their session there until the 8th of the same month and year.

The defendant lastly read in evidence an extract from the record of a judgment in an action of ejectment for said lots, in the district court of the United States, in which the said Daniel F. Strother was plaintiff, and said John B. Lucas was defendant; and there closed his case in defence.

The plaintiff in reply, proved by extracts from the records of the board of commissioners, that the defendant was a member of the board before which Auguste Choteau filed his claim as assignee of St. Cyr, assignee of the original grantees; and that while said claim was pending, and before any action of the board was had upon it, Lucas being still a member of the board, took the deed of conveyance aforesaid, of the 11th January, 1808, from said Auguste Choteau.

It is admitted on the record, that the plaintiff is a citizen of Ken-

tucky, and that the premises in dispute are worth more than two thousand dollars. .

The case being closed on each side, the plaintiff then moved the court to instruct the jury as follows:

1. That there is evidence before the jury of the possession and title of Rene Kiersereau and John B. Gamache, as absolute owners and proprietors of the two forty arpents lots described in the declaration.

2. That there is evidence before the jury of the possession and title of Louis Chancellier, as owner and proprietor of the two forty arpents lots in question, as assignee of said Rene Kiersereau and said John B. Gamache, respectively.

3. That there is evidence of the actual possession after the death of said Louis Chancellier by his widow, said Marie Louise, of said two forty arpents lots, claiming the same as absolute owner thereof.

4. That the plaintiff has established his title as assignee of Marie Louise Chancellier, to the estate and interest vested in her and her heirs, in and to the two forty arpents in question.

5. That the deed given in evidence by plaintiff from Auguste Gamache to Bazil Laroque and Marie Louise, his wife, enures to the benefit of the plaintiff.

6. That if the jury shall be of opinion from the evidence, that Hyacinth St. Cyr originally obtained possession of the lots in question, as tenant of Marie Louise, the widow of Louis Chancellier, or by virtue of a permission to occupy and cultivate, given to said St. Cyr, by the syndic of the village of St. Louis; the possession of St. Cyr, so obtained, shall be taken by the jury as, in law, the possession of said Marie Louise.

7. That the confirmations of the board of commissioners, on the 23d July, 1810, of which the defendant was a member, could, at most, only operate as a quit-claim by the United States in favour of the original grantees; and could not decide the question of derivative title, under said original grantees.

8. That the mere fact of the land described in the confirmation to Choteau, and the land described in the confirmation given in evidence by the plaintiff, and the declaration being identical, does not entitle the defendant to a verdict in his favour.

9. That no forfeiture or disqualification has accrued against Madame Marie Louise, the widow of Louis Chancellier, or against her assigns, under any act of congress, whereby she or they are barred

from asserting their legal and equitable rights to the lots in question before this court.

Which instructions were given by the court.

The plaintiff also moved that the following instructions be given to the jury:

1. That the sale, and partition, and final decree, of which duly certified copies have been given in evidence by the plaintiff, establish the title of the widow of Louis Chancellier, Madame Marie Louise Des Champs and her heirs, to the land described in said sale and partition, as sold and allotted to her, part of which said land consists of the two arpents by forty in the declaration described, bounded by Bijou on the one side, and by John B. Bequette on the other.

2. That independently of the title of Rene Kiersereau and John B. Gamache, there would be sufficient evidence before the jury to establish a title by prescription in Louis Chancellier and his heirs, and Marie Louise, his widow and her heirs, to the two forty arpents described in the declaration.

3. That Hyacinth St. Cyr took no title by prescription in and to said lots.

4. That if the jury shall be of opinion that Hyacinth St. Cyr had notice of the sale of said lots to Marie Louise by the proper Spanish authority, as given in evidence by the plaintiff; the possession of said Hyacinth St. Cyr of said arpents, was not such as could be adverse to said Marie Louise, or could create an estate by prescription in favour of said St. Cyr.

5. That if the jury shall be of opinion from the evidence that St. Cyr was a purchaser at the public sale of the property of Louis Chancellier, or signed his name, or made his mark as purchaser on the margin of said sale; these facts are prima facie evidence that said St. Cyr had notice of the title of said Marie Louise as purchaser at said sale of the lots therein described, as sold to her.

6th. That the deeds given in evidence by the defendant from Rene Kiersereau, bearing date the 23d of October, 1793, conveyed nothing to St. Cyr; being made by a person out of possession, and whose conveyance for the same land by another person to Chancellier, was upon record, and who, therefore, was guilty of the crime of "Estelionato," punishable by fine and banishment, by the Spanish law then in force.

7th. That the deed given in evidence by defendant from Joseph Gamache to Hyacinth St. Cyr, dated 23d October, 1793, is void, on

the ground of "Estelionato," in Batis Gamache, supposing that he made the deed: 2d, on the ground of uncertainty in the deed itself, in this, that it purports to be a deed of Joseph Gamache, and is signed Batis ⋈ Gamache.

8th. That Auguste Choteau took no estate by prescription in either of said forty arpent lots in question.

9th. That there is no evidence of possession, whatever, adverse or otherwise, by Auguste Choteau, of said two forty arpents lots, or of any part thereof.

10th. That if the jury shall be of opinion, from the evidence before them, that the said Auguste Choteau had notice of the public sale of said lots to Madame Marie Louise Chancellier, his possession or claim to said lots under Hyacinth St. Cyr is fraudulent and void, as against said Marie Louise and her heirs and assigns.

11th. That the certified copy of the proceedings and sale by the syndic in the matter of Hyacinth St. Cyr, a bankrupt, is not evidence either of St. Cyr's title to either of the lots in question, or that the same were sold by said syndic to said Auguste Choteau, as part of said St. Cyr's property.

12th. That the defendant has shown no title by prescription under the Spanish or civil law, or by the statutes of limitation, (in bar of plaintiff,) under the Anglo-American laws to the lots in question.

13th. That the title of the defendant, as assignee of Auguste Choteau, is vitiated by the fraud which vitiates the title of Choteau and of St. Cyr.

14th. That the deed from Auguste Choteau and wife to Lucas, of the lots in question, dated 11th January, 1808, is void for fraud; if in the opinion of the jury it was a sale and conveyance to Lucas of a claim and interest pending before said Lucas himself for adjudication.

15th. That if, in the opinion of the jury, the claim was pending before Lucas as commissioner when he bought it, the adjudication or confirmation of it on the 23d July, 1810, by the board of commissioners, of which Lucas was a member, is fraudulent and void at law and in equity.

16th. That neither the statute of limitation, nor the Spanish law of prescription can avail the defendant, Lucas, independently of the possession of St. Cyr and Choteau.

17th. That the orders of survey given in evidence by the defendant, and made by himself and his two colleagues in favour of Auguste Choteau, bearing date June 10, 1811, was fraudulent and

void; if the jury shall be of opinion from the evidence that the claims therein ordered to be surveyed, had been sold to said defendant by said Choteau previous to the date of said order, and while said claims were pending for adjudication before said defendant, as a member of the board of commissioners, in said order mentioned.

18th. That if any penal effect resulted from any act of congress to Mad. Chancellier and her assigns, or to the legal representatives of Rene Kiersereau and J. B. Gamache; the act of congress of January, 1831, entitled "an act further supplemental to the act entitled an act making further provisions for settling the claims to lands in the territory of Missouri," passed the thirteenth day of June, one thousand eight hundred and twelve; remits the parties to their original legal and equitable rights and titles, as if no such penal acts had ever been in force.

19th. That upon the case made by plaintiff he is entitled to a verdict for all that part of the two forty arpents lots in question, situated west of 7th street, in St. Louis, and all the lots east of 7th street, according to the admissions of defendant as above.

20th. That in this case there is no law or binding ordinance of the Spanish government, by which Madame Chancellier and those claiming under her could be deprived, according to the state of the evidence in this case, of whatever title she acquired to the land in question, under the purchase made of it by her as the property of her husband.

21st. That if the jury believe from the evidence that St. Cyr ceased to cultivate and be in actual possession of the premises in dispute from 1797 or 1798, prescription ceased to run in his favour, and that of those who claim under him from that time.

Which instructions the court refused to give; but instructed the jury in relation to the matters referred to in the first instruction above refused: "that the sale, and partition, and final decree, the record of which certified copies have been given in evidence by the plaintiff, did pass the title of Louis Chancellier, mentioned in said proceedings of sale, such as it was at the time of his death, or such as it was in his heirs at the time of said sale to Madame Marie Louise, his widow, mentioned in said proceedings, and her heirs to the lands described in said record of sale and partition, as sold and allotted to her."

And further instructed the jury, in relation to the matters mentioned in the fifth instruction above refused: "that if the jury should

be of opinion that St. Cyr, under whom the defendant claims, was a purchaser at said public sale of the property of said Louis Chancellier, or did sign his name or make his mark on the margin of the record of said sale; these facts, or either of them, is evidence proper for them to consider in ascertaining whether said St. Cyr had notice of the said title of said Marie Louise as purchaser at the said sale of the lots described in the record thereof as sold to her."

And further instructed the jury in relation to the matters referred to in the eleventh instruction above refused: " that the certified copy of the proceedings and sale by the syndic of the property and estate of St. Cyr as a bankrupt, was not evidence of a title to said St. Cyr to the lots in question, or either of them."

And further instructed the jury in relation to the matters referred to in the twelfth instruction above refused, and to the statutes of limitation referred to in that refused instruction: " that the defendant had shown no title to the lots in question, nor any bar to the plaintiff's recovery under any statute or statutes of limitation."

And further instructed the jury in relation to the matters referred to in the sixteenth instruction above refused: " that the statute of limitations could not avail the defendant Lucas, either with or independent of the possession of St. Cyr."

And further instructed the jury in relation to the matters referred to in the eighteenth instruction above refused: " that although the act of congress of the 31st of January, 1831, referred to in said refused instruction last mentioned, does not remit the penalties as in that refused instruction is supposed by the plaintiff; yet, that in fact no penal effect results from any act of congress which bars or stands in the way of plaintiff's recovery in the present action, or which in any manner affects his title, or evidence of title, under, or to be derived from said acts, or any of them, under the admissions of the parties in the present case."

The counsel for the plaintiff excepted to the opinion of the court in refusing to give the several instructions; as well as to the opinion of the court in giving the instructions which they did give.

The defendant then moved the court to instruct the jury as follows:

1st. That if the jury find from the evidence that Hyacinth St. Cyr, and those lawfully claiming under him, have possessed the two arpents by forty, surveyed for Gamache and Kiersereau, without in-

terruption, and with claim of title for thirty years, consecutively, prior to 1818, the plaintiff is not entitled to recover in this action.

2d. If the jury find from the evidence, that Hyacinth St. Cyr, and those lawfully claiming under him, possessed the two lots in the declaration mentioned for ten years, consecutively, prior to and until the 23d day of July, 1810; and that the lands confirmed to Auguste Choteau on that day are the same lands in the declaration mentioned, the plaintiff cannot recover in this action.

3d. If the jury find from the evidence that the defendant possessed the lots of land in the declaration mentioned for ten years, consecutively, prior to the 1st of October, 1818, the plaintiff cannot recover in this action.

Which instructions the court gave to the jury, with the further instruction; "That the possession mentioned must be an open and notorious possession; and that if they should find such possession, it gave title under, and according to the Spanish or civil law, which was in force in Upper Louisiana at the date of the treaty by which Louisiana was acquired by the United States; and remained in force and unabrogated by any law of the district of Louisiana or of Missouri down to a period as late as October, 1818. That the possession of ten or thirty years would give a title, the one period or the other, according to the circumstances under which the possession was obtained. That the ten years possession which would give a prescriptive title, must be a possession under a purchase made in good faith; and where the purchaser believed that the person of whom he purchased had a good title; and where the owner of the title prescribed against resided in the same country during the said ten years. That if the jury believe from the evidence, that the possession of St. Cyr, under whom the defendant claims, was obtained under a purchase made by him in good faith, and under the belief that the person of whom he purchased had a good title; and that the possession of Choteau, under whom the defendant claims, was obtained in like manner, and under a purchase made with the like belief; and that they had the possession mentioned in the second instruction asked for on the part of the defendant; and that the said Marie Louise was in the country during the said ten years: the plaintiff cannot recover in this action."

And further instructed the jury in relation to the possession mentioned in the third instruction asked for on the part of the defendant, "that to make the possession there mentioned a bar to the plaintiff's

recovery in the present action, the possession of the defendant must have been obtained under a purchase, where he believed that the person of whom he purchased had a good title; and that the said Marie Louise was in the country during the said ten years, which, unless the jury believe, they cannot find for the defendant upon such possession."

To which opinion the plaintiff excepted.

Afterwards the judge, of his own motion, further instructed the jury as follows:

That the possession which the said Louis Chancellier had at the time of his death passed to his heirs, and afterwards to his widow, the said Marie Louise, under the purchase made by her at the said public sale of the estate of the said Louis, and that the possession of the said Marie Louise would be presumed to contir ɔ in her and her heirs, until an adverse possession was shown; and would continue in her, her heirs or assigns, until an adverse possession was actually taken.

And further instructed the jury, that if they should find from the evidence that said St. Cyr took possession, or was in possession of the lands in controversy, or any of them, under the said Marie Louise, or as her tenant, his possession, so taken or held, would be the possession of the said Marie Louise, and would not be a possession in St. Cyr, available by him or those claiming under him, under the law of prescription mentioned. But, that if the jury should be of opinion that said St. Cyr came to the possession of the land in controversy, not as the tenant of the said Marie Louise, or under her, but under a claim and title adverse to her, such adverse claim and possession would constitute a possession upon which a prescription, by the Spanish or civil law referred to, and then in force, would begin to run in favour of him, and those claiming under him, if such possession was actual, open, and notorious; and that such possession, so commenced, would constitute and preserve to said St. Cyr, his heirs or assigns, a possession, available under the law of prescription referred to, notwithstanding said St. Cyr, or those deriving title from him, should leave the actual possession, or cease to occupy and cultivate, if that abandonment of the actual possession, occupancy, or cultivation, was with the intention to return, and without any mental abandonment of the possession.

And further instructed the jury, that if they should be of opinion from the evidence, that Rene Kiersereau, under whom the parties

claim, did attest the sale of the lot in controversy, which both parties, in the present case, claim under him, alleged to be made by Marie Reno Robillia to said Louis Chancellier, by becoming a subscribing witness to the instrument of sale in evidence on behalf of the plaintiff, and purporting to be signed by said Marie Reno Robillia, and that said Rene Kiersereau, at the time of becoming such subscribing witness, was the husband of said Marie Reno, the title of said Rene Kiersereau would, from his presumed assent to said sale, and presumed receipt of the consideration expressed in said instrument, as the husband of said Marie Renno, in presumption of law, pass by said sale to Louis Chancellier. That the subscribing witnesses to a sale in writing, made before a notary or other officer acting as such, are presumed to have been informed of the contents of the written instrument of sale, because, by the civil or Spanish law referred to, which was in force in Louisiana, it was the duty of the notary or other officer to make known to the witness, as well as to the parties, the contents of the writing which they attested and subscribed. But that the jury would consider, from the evidence, and the circumstances in evidence, in this case, whether the said Rene, being the husband of the said Marie Reno, did become the subscribing witness to said instrument. And if they should be of opinion that he did not, or that the same is fraudulent, as against him, his title was not passed by the alleged sale. That if the jury find that the title of said Rene Kiersereau did pass by said sale to said Louis Chancellier, and that the land so acquired by him, and also the land derived by the plaintiff under said Gamache, are the said lands mentioned in the declaration; they will find a verdict for the plaintiff for those lands, or so much thereof as are described in the declaration: unless they find that the title has been lost by him, or those under whom he claims by prescription, according to the principles already stated by the court.

And further instructed the jury, that if they should find from the evidence, that the residue of the land mentioned in the declaration, or any part thereof, was in the possession of Louis Chancellier at the time of his death, and that he and those claiming under him had such possession for thirty years, consecutively, they would find for the plaintiff, for such residue, so possessed; unless they should find that his right, so acquired, had been lost by prescription, under an adverse possession, according to the principles already stated.

The case was argued by Mr. Lawless and Mr. Benton for the plaintiff in error: and by Mr. Geyer and Mr. Jones for the defendant.*

In support of the assignment of errors in this case, the plaintiff's counsel contended:

1. That the lots in question constituted a property in the grantees thereof, and their heirs or assigns; which was protected and guarantied by the treaty of cession of Louisiana by France to the United States.

2. That at the date of the treaty of cession of Louisiana by France to the United States, the lots in question were vested, by title of the highest order, in Marie Louise, the widow of Louis Chancellier; who died in April, 1785.

3. That the original grant of said lots, respectively, has not only been vested, by title of the highest order, in Marie Louise, as far as said title could be given by the supreme power in Louisiana, while a province of Spain; but has since been confirmed by the government of the United States to said original grantees and their legal representatives.

4. That at the date of said confirmation by the United States, the said Marie Louise, the widow of Louis Chancellier, was the true assignee and legal representative of the said original grantees.

5. That the title of said Marie Louise and of said original grantees is now fully vested in the plaintiff.

6. That the title of the plaintiff, as assignee of Marie Louise, the widow of Louis Chancellier, to the lots in question, has been fully made out and established by the evidence in this cause; and has not been invalidated or rebutted by the defendant, either by showing a better title under the original grantees, or by showing a title in him by prescription, or limitation, or forfeiture, or escheat; or by establishing any other title adverse to that of plaintiff.

Mr. Justice BALDWIN delivered the opinion of the Court:

The plaintiff brought an ejectment in the district court of Mis-

* The reporter has been most kindly furnished with the arguments of Messrs. Lawless and Benton, the counsel for the plaintiff, which has been prepared by Mr. Lawless with great ability and learning. It was his wish and intention to insert it in the report of the case, had he received the argument for the defendant in time. The argument for the plaintiff will be found in the "Appendix;" where will also be found the argument for the defendant, should it be received before the completion of this volume.

[Strother v. Lucas.]

souri, to recover possession of two pieces or tracts of land, formerly common field lots adjacent to the village, and now part of the city of St. Louis; a verdict and judgment was rendered for the defendant, on which the plaintiff brought his writ of error. The whole merits of the case have been brought before us, by the whole evidence given at the trial; and forty-three instructions asked, refused, or given, spread out in the record; which present a case of great interest, as well in reference to the value of the property in controversy, as the principles which are necessarily involved in its decision.

Both parties claim under Rene Kiersereau, and John B. Gamache; each of whom were in possession of one of these lots, at a very early period after the founding the village of St. Louis in 1764, while Louisiana was under the dominion of France, though she had ceded it to Spain two years before by the *secret* treaty of Fontainebleau. Spain took possession of the province in 1769–70, from which time she held it till she ceded it to France in 1800: the laws of Spain were established in it, but the title of those who had received grants from the local authorities, or made settlements, either in the villages or on the public domain, before the actual surrender of the province by France, were respected. Accordingly it appears, that in 1772, the following instrument was executed between the French and Spanish governors, which is found in the 3d Vol. Am. State Papers—Public Lands, and is of the tenor and purport following:

Translation of a French document marked C., published in the third volume of the American State Papers—Public Lands, p. 679, truly and faithfully made and written by me, Robert Greenhow, translator of foreign languages in the department of state of the United States.—Washington, February, 26, 1838.

*Cadastre** formed by me, Martin Duralde, surveyor, appointed by Mons. Don Pedro Piernas, captain of infantry, and lieutenant governor of the establishments and other dependencies of the Spanish government of the Illinois, and deposited in the archives of the said government in form of proces-verbal, to serve to designate the various tracts of land granted in the name of the king to the inhabitants of this post of St. Louis; as well by title [deed] as by verbal consent, by the chiefs who have governed them from the foundation

* Note by the translator.—A *cadastre* is an official statement of the quantity and value of real property in any district, made for the purpose of justly apportioning the taxes payable on such property.—R. G.

[Strother v. Lucas.]

[of the government] to this moment, which I have surveyed; and which, after the exchanges, cessions or sales which may have been made of them, for the convenience or advantage of each person, are actually in the possession of the persons hereinafter named, agreeably to their own attestations and reciprocal acknowledgments, situated in the prairies contiguous to this same post, in the order and according to the directions detailed as follows:

I thus attest it by my signature, and by the unanimous acknowledgments of all the abovementioned proprietors, assembled at this moment, with the approbation of my said Sr. Don Pedro Piernas, in the chamber of the government, to serve as mutual witnesses, and to affirm the fact, some by their signatures, the others, from not being able to sign, by their declarations in presence of Messrs. Don Pedro Piernas, the abovementioned lieutenant governor, and Don Louis St. Ange de Bellerive, retired captain and first predecessor in command of this said post, both serving, to wit: the latter, to certify by his signature, in his said quality, and in virtue of the power confided to him, that he had granted either by title [deed] or verbally the abovementioned lands, in the name of his majesty (the king of France); and my said Sr. Piernas, to approve, confirm and ratify likewise, by his signature, in his actual character of lieutenant governor, whereby he is provided with the same power of granting [conceder] the possessions allowed to be good [accordées]* by my said Sieur de St. Ange, and specified in the body of this cadastre, which I deposite, containing sixty-eight pages of writing, including the present, in the archives of this government, to be there preserved forever, and to serve for the uses, the assurance, authenticity and testimony of all therein set forth, at St. Louis, on the twenty-third of May, in the year one thousand seven hundred and seventy-two.

|                    |                |
|--------------------|----------------|
| M. Duralde,        | Amable Guyon,  |
| Laclede Liguest,   | Sarpy,         |
| Dodie,             | Cotte,         |
| A. Conde,          | St. Ange,      |
| Rene Kiersereau,   | Pedro Piernas. |
| Becquet.           |                |

St. Louis, January 7, 1812.                M. P. Leduc, T. B. C. L. T.
True extract from the Livre Terrein, Book N. 2.

* Note by the translator.—The French word *conceder* means *to grant*; *accorder*, among many significations, of which *to grant* is one, has that of acknowledging or declaring any proposition to be good or true; and from the context, such appears to be its sense in the paper here translated.  R. G.

[Strother v. Lucas.]

Pursuant to this most solemn act, surveys were made of the lots respectively claimed and possessed by Kiersereau and Gamache, by the public surveyor, and entered of record on the land book of the province; and they continued in the quiet enjoyment of the lots from that time, as they had previously held them according to the laws, usages, and customs of France, while under the government of the province of the Illinois.

The plaintiff claims the premises in controversy under and in right of Kiersereau and Gamache, by the following chain of title:

1. By a deed made in 1781, from Marie Magdalena Robellar, the wife of Rene Kiersereau, to Louis Chancellier, conveying one of the lots in question, (being the one owned by Kiersereau,) containing one arpent in front, by forty in depth, to which, as the plaintiff alleged, Kiersereau was an assisting witness, whereby his right passed to the grantee of his wife, according to the law of Spain, in force in the province. The consideration was four hundred livres, equal to eighty dollars.

2. By deed of exchange, made in 1773, between Chancellier and Gamache, whereby the latter conveyed to the former one-half of his lot, being one-half arpent in front by forty back, in exchange for an ox; and a half front arpent, by the same depth, which Chancellier had owned before.

Both deeds were executed in the hall of the government, in the presence of the local governor, and signed by him. The witnesses of assistance to the latter were, M. Duralde, the surveyor general, and Alvarez, a sergeant in the garrison; to the former, the witnesses of assistance were, as named in the concluding clause of the deed, "Rene Gueircero," and in the attestation, "Rene Kirgeaux," and Louis Rover.

3. By a deed from one of the heirs of Gamache, conveying to Basil and Marie Louise Laroque (formerly Madame Chancellier,) his right in and to the remaining half of Gamache's lot, for the consideration of one dollar. This deed bears date 22d June, 1827.

4. By deeds from Laroque and wife, made in March, 1827, and September, 1828, conveying to George F. Strother, the two arpents by forty, to which she claimed right under Gamache, Kiersereau, and Chancellier, in consideration of three hundred dollars.

5. By deed from George F. Strother to Daniel F. Strother, the plaintiff, dated July, 1827, conveying the premises in controversy to him for the consideration of three hundred dollars.

[Strother v. Lucas.]

The title of Laroque and wife is thus deduced:

Louis Chancellier took possession of the lots conveyed to him as before, held and cultivated them till his death, in 1785; when, by a judicial proceeding before the lieutenant governor, in his judicial capacity, conducted in conformity with the laws of Spain, the whole estate of Chancellier was inventoried, and appraised by sworn appraisers; the result of which was, that a final adjudication was made in 1787 by the governor, which was signed by him and the parties concerned, who consented thereto. By this adjudication, the real and personal estate of Chancellier, after the payment of his debts, was divided between his widow and their only child, according to the laws of distribution in the province; the one and a-half arpents were allotted to the widow at one hundred and fifty-five livres, equal to thirty-one dollars, for the sixty arpents, being fifty-one cents per arpent: the half arpent was also allotted to her at eight livres, equal to one dollar sixty cents for the twenty arpents; being eight cents per arpent; which is a little more than four-fifths of the English acre, the proportion between them being as one hundred of the former to eighty-five of the latter.

Madame Chancellier married again in 1787 or 8, about two and a-half years after Chancellier's death, and immediately removed with her husband, one Beauchamp, to St. Charles, a village about twenty or twenty-five miles from St. Louis; where she continued to reside, without making any claim to the lots, till about 1818: and no suit was brought to recover possession thereof till the present plaintiff prosecuted his claim, under her right, in the case between the same parties, reported in 6 Peters, 763.

Waiving, for the present, the consideration of a question raised at the trial, whether Rene Gueircero, or Rene Kirgeaux, was the real and true Rene Kiersereau, the rightful owner of part of the property in controversy between the parties, or another person, we are clearly of opinion, that Madame Chancellier, in 1787, had a good title to the forty arpents formerly owned by Kiersereau, and the twenty arpents conveyed in exchange by Gamache to Chancellier, in such right, and by such tenure as was given and prescribed by the laws of Spain, and the province, which will be hereafter considered; and that we cannot now question the validity of those acts of the local governor, whether acting in his political or judicial capacity, for reasons hereafter to be given.

As to the twenty arpents held by Gamache, there is no written

evidence that his right thereto was ever conveyed in whole or part, before 1827, to the plaintiff, or any person under whom he claims; nor is there to be found in the record, any other evidence of any right thereto in Chancellier, unless it may have been by possession or mere claim. We find in the inventory and appraisement of his estate, in 1785, that the sixty arpents were then in wheat, valued at six hundred livres, equal to one hundred and twenty dollars, or two dollars per arpent, with the crop in the ground; and the twenty arpents, valued at fifteen livres, equal to three dollars, or fifteen cents per arpent; also that the whole eighty arpents were allotted to the widow, by the final adjudication in 1787. This is, undoubtedly, evidence of a claim by Chancellier, and its recognition by the local authorities, of its rightful existence, so far as it extends, competent for the court below, and jury, to consider. But, for the present, we shall take these proceedings, and any possession by Chancellier, as not operating, per se, to divest the lawful title of Gamache to the twenty arpents, such as it was under the laws of Spain, the acts of the local authorities, and his possession and cultivation pursuant thereto. Whether there is any evidence in the record which can have that effect, will be a matter for future consideration, should it be deemed important.

Thus taking the plaintiff's title, we proceed to state that of the defendant, who claims under and in right of Hyacinth St. Cyr, who, about 1788, took possession of the two lots, and continued to cultivate the front thereof for ten consecutive years, till 1798, 99, when the fence having been destroyed, the lots remained open till 1808. St. Cyr claimed in virtue of a parol sale by Madame Chancellier to him, after the adjudication, by his possession delivered to him by the local officer, charged with the supervision of the common field lots of the village; agreeably to the local laws, its usages and customs, conformably to the laws of Spain, together with his uninterrupted cultivation as aforesaid.

2. By two deeds, one from Kiersereau, the other from Gamache, both dated 23d October, 1793, both originals, found among a great number of deeds in the ancient archives of the country, delivered and handed over to the recorder of St. Louis county, after the cession in 1803, and both executed by the parties, in the presence of, and signed by the governor, with the attestation of two witnesses of assistance. Each deed conveys the lot owned by the grantor, with a clause of warranty, reciting St. Cyr as having been in possession

several years; that of Kiersereau being for the consideration of five hundred and twenty-five, and that of Gamache, for three hundred livres; equal to one hundred and sixty-five dollars for both.

3. By the following entries on the Land Book, containing the record of the official survey for Rene Kiersereau, "1793, St. Cyr, 1 Arpent;" and the following on the survey of " Joseph Gamache, 1793; St. Cyr, 1 Arpent; name of said Gamache is Baptiste, instead of Joseph;" which entries must be taken to denote, that St. Cyr then claimed the lots under the parties for whom the original surveys were made and recorded.

4. By a judicial proceeding against St. Cyr, as a bankrupt, had before the lieutenant governor, in his judicial capacity, in 1801, by which the two lots were seized, appraised by sworn appraisers at ten dollars, and sold to Auguste Choteau, as the property of St. Cyr, at the church door, at the conclusion of high mass, for twelve dollars, payable in peltries at the current price, in April, 1802; for which one Sanguinet was security. The whole proceeding in the sale was executed in the presence of the witnesses of assistance; one of whom was the surveyor general; the appraisers, St. Cyr, the syndic, and the lieutenant governor, who all signed the proceedings.

5. By the proceedings of the board of commissioners of the United States, for adjusting land titles in Missouri, in 1809, and 10, by which it appears that Choteau filed his claim to these lots in 1806, according to the acts of congress, as the assignee of St. Cyr, assignee of Rene Kiersereau, and Joseph Gamache. He produced to the board the concessions for the same, registered in the Livre Terrein, plots of the surveys, copies of the deeds from Kiersereau and Gamache, to St. Cyr, with a certified copy of the proceeding of bankruptcy against him, by which Choteau became the purchaser of the two lots; and that the board, consisting of Mr. Penrose and Bates, confirmed the lots to Choteau, according to the recorded surveys in the Land Book, No. 2, folio 11.

6. By a deed from Auguste Choteau to the defendant, dated in January, 1808, conveying him the two lots in question, for the consideration of four hundred and fifty dollars.

7. By the confirmation of the rights, titles and claims to town or village lots, out lots, common field lots, and commons, adjoining or belonging to the town of St. Louis, and others, which have been inhabited, cultivated, or possessed, prior to the 20th December, 1803,

to the inhabitants thereof, according to their several right or rights in common thereto.

8. By the actual continued possession of the two lots by the defendant, from 1808 till the trial, as then admitted by the plaintiff.

Waiving at present the question which arose below as to the identity of the Gamache who conveyed to St. Cyr in 1793, with the Gamache who was the owner of the lot, on account of the name of "Joseph Gamache," being in the granting part of the deed, and the mark of "Baptiste Gamache" at the foot, with the mark of Hyacinth St. Cyr, as has been done in relation to the similar objection to the deed from M. M. Robillar to Chancellier, in 1781; we are clearly of the opinion, that the title of the defendant must be held valid unless the plaintiff has sustained some of his objections thereto, by the law, or the facts of the case, as they appeared from the evidence, on which the instructions of the court must be taken to be founded, as the subject matter, to which a reference is necessarily made by the counsel in the court below.

When this cause was before us in 1832, it was decided on the case, as made out by the plaintiff on the trial; the defendant offered no evidence; and neither court did or could decide on the rights of the parties, as they may depend on the record, written and parol evidence, presented for consideration in the present record. Had this case been identical with the former, as to the merits, we should have followed the deliberate opinion delivered therein; but as one judgment in ejectment is not conclusive on the right of either possession or property in the premises in controversy, the plaintiff has a right to bring a new suit; and the court must consider the case, even if it is in all respects identical with the former: though they may hold it to be decided by the opinion therein given. It is otherwise, when the second case presents a plaintiff or defendant's right, on matters of law or fact, material to its decision, not appearing in the record before; it then becomes the duty of the Court to decide all pertinent questions arising on the record, in the same manner as if the case came before them for the first time, save such as arise on evidence identical as to the merits. In this case, we deem it a peculiar duty, enjoined upon us by the nature of the case, the course of the able and learned arguments as to the law of Spain and her colonies, in its bearing on the interesting question before us; together with a view of the consequences of our final decision thereon. Were we to leave any questions undecided which fairly arise on the record, or to de-

[Strother v. Lucas.]

cide the cause on points of minor importance only, the value of the premises would justify future litigation; which no court of chancery might think proper to enjoin so long as new and material facts could be developed, or pertinent points of law remained unsettled.

There is another consideration of imperious consequence in relation to the rights of property claimed by virtue of public or private grants, of sales by judicial process, by formal deeds, or informal writings by parol agreements, or by possession alone, for long time, in all parts of the country; especially those new and flourishing, and most emphatically, when the property was originally held under the laws and usages of a foreign government; and above all, in such a case as this.

By the record evidence before us of judicial sales, which, by the admitted laws of Spain, transfer to the vendee both title and possession in virtue of adjudication, which, after the lapse of fifty-one years after one such sale, and thirty-seven of the other, we must, on every principle of law take, as importing absolute verity in all things contained in such record; and not suffer it to be questioned. It appears by a record thereof, that the right of Chancellier was sold in 1787, for thirty-two dollars and sixty cents; and of St. Cyr, in 1801, for twelve dollars; the aggregate of both sales being only forty-four dollars sixty cents, a sum not sufficient to pay the printing in this case. What the value of the premises now is, or may be in future, cannot well be known; but as the law of this case is the law of all similar ones now existing, or which may arise, it is our plain duty to decide it on such principle. That while we do as the law enjoins, respect ancient titles, possession and appropriation, give due effect to legal presumptions, lawful acts, and to the general and local laws, usages, and customs of Spain and her colonies; we do not adjudge a title to be in either party, which rests on acts incompetent to vest, transfer, or hold property, in opposition to that party in whom the right exists, by the laws of the land, and established rules and principles, which vest property and regulate its transmission and enjoyment.

The state in which the premises are situated was formerly a part of the territory, first of France, next of Spain, then of France, who ceded it to the United States by the treaty of 1803, in full propriety, sovereignty and dominion, as she had acquired and held it; 2 Peters, 301, &c.: by which this government put itself in place of the former sovereigns, and became invested with all their rights, subject to their

[Strother v. Lucas.]

concomitant obligations to the inhabitants. 4 Peters, 512; 9 Peters, 734; 10 Peters, 330, 335, 726, 732, 736. Both were regulated by the law of nations, according to which the rights of property are protected, even in the case of a conquered country, and held sacred and inviolable when it is ceded by treaty, with or without any stipulation to such effect; and the laws, whether in writing, or evidenced by the usage and customs of the conquered or ceded country, continue in force till altered by the new sovereign. 8 Wheat. 589; 12 Wheat. 528, 535; 6 Peters, 712;-7 Peters, 86, 87; 8 Peters, 444, 465; 9 Peters, 133, 734, 747, 748, 749; Cowp. 205, &c.; 2 Ves. jr. 349; 10 Peters, 305, 330, 721, 732, &c. This Court has defined property to be any right, legal or equitable, inceptive, inchoate, or, perfect, which before the treaty with France in 1803, or with Spain in 1819, had so attached to any piece or tract of land, great or small, as to affect the conscience of the former sovereign, " with a trust," and make him a trustee for an individual, according to the law of nations, of the sovereign himself, the local usage or custom of the colony or district; according to the principles of justice, and rules of equity. 6 Peters, 709, 714; 8 Peters, 450; 9 Peters, 133, 144, 737; 10 Peters, 105, 324, 331, 35, 36. The same principle has been applied by this Court, to the right of a Spanish town, as a municipal corporation. 10 Peters, 718 to 736; passim, 144, 734, 736; 10 Peters, 105, 324, 331, 335, 336. Vide also 1 Ves. sen. 453; 2 Bligh, P. C. N. S. 50, &c.

This Court has also uniformly held that the term grant, in a treaty, comprehends not only those which are made in form, but also any concession, warrant, order or permission to survey, possess or settle, whether evidenced by writing or parol, or presumed from possession; (vide the cases last cited,) 8 Peters, 466–7; 9 Peters, 152, 170; 10 Peters, 331–40; S. P. 10 Peters, 718, &c.; and that in the term laws, is included custom and usage, when once settled; though it may be " comparatively of recent date, and is not one of those to the contrary of which the memory of man runneth not, which contributed so much to make up the common law code, which is so justly venerated." 9 Wh. 585. Its evidence consists in the sense and understanding of parties in their contracts, which are made with reference to such usage or custom: for the custom then becomes a part of the contract, and may not improperly be considered the law of the contract, and it rests on the same principle as the lex loci. " All contracts are to be governed by the law of the place where they

[Strother v. Lucas.]

are to be performed; and this law may be, and usually is proved as matter of fact." The rule is adopted for the purpose of carrying into effect the intention and understanding of the parties. 9 Wh. 588; S. P. 12 Wh. 167–8, 601; 5 Wh. 309; 6 Peters, 715, 771; 8 Peters, 372; 9 Peters, 734–5; 10 Peters, 331, 712, 724–9, 730; as universally understood and admitted, 9 Peters, 145, by the people of the vicinage, 5 Wh. 384; as considered by the public for years, 10 Peters, 722; 11 Peters, 53; and a right so acquired is as inviolable as if it was founded on a written law. 9 Peters, 145. It exists by a common right, which means a right by common law; which is called right, and sometimes common right, or the laws and customs of England, the statutes and customs of the realm; and what is properly the common law, is included within common right. Co. Litt. 142, a. b. It is so called because it exists in all the subjects by the common law, an universal custom; and is thus distinguished from the same right, claimed by a local custom in favour of the inhabitants of a particular place, 6 Peters, 715; and by an exclusive private right, in one or more individuals, by a prescription in their own favour. Co. Litt. 113, b.; Wood Inst. 4, 6, 7 D. C. D. 93; 1 Bl. Com. 75, 263. The common right of the subject existed before any prescription, Mo. 574–5; 2 Wils. 299; it must be set up as such, and not by prescription, Willes, 265: "for a man shall not prescribe in that which the law of common right gives," Noy. 20: for the common law is the best and most common birthright that the subject hath, for the safeguard and defence of his rights of person and property, Co. Litt. 142, a.

Every country has a common law of usage and custom, both local and general, to which the people, especially those of a conquered or ceded one, cling with more tenacity than to their written laws, and all sovereigns respect them. The people of Kent contended with the conqueror of England, till he confirmed their local customs and tenure, which continue to this day; and history affords no instance where the people have submitted to their abrogation without a struggle; as was the case in Louisiana, when they found that the laws of France and the custom of Paris were about to be superseded by those of Spain; vide 1 Partid. preface; White, 205.

No principle can be better established by the authority of this Court, than "that the acts of an officer, to whom a public duty is assigned by his king, within the sphere of that duty, are prima facia taken to be within his power." "The principles on which it rests, are

[Strother v. Lucas.]

believed to be too deeply founded in law and reason, ever to be successfully assailed.. He who would controvert a grant executed by the lawful authority, with all the solemnities required by law, takes on himself the burthen of showing, that the officer has transcended the powers conferred upon him, or that the transaction is tainted with fraud." 8 Peters, 452-3--5, 464; 9 Peters, 134, 734-5; S. P. 6 Peters, 727, &c.; and cases cited: 10 Peters, 331; S. P. 1 Paine, 469--70. The same rule applies to the judicial proceedings of local officers, to pass the title of land according to the course and practice of the Spanish law in that province (West Florida), 8 Peters, 310. Where the act done is contrary to the written order of the king, produced at the trial, without any explanation, it shall be presumed that the power has not been exceeded; that the act was done on the motives set out therein; and according to some order known to the king and his officers, though not to his subjects. 7 Peters, 96; 8 Pet. 447, 451-4-6; "and courts ought to require very full proof, that he had transcended his powers, before they so determine it." 464; 9 Peters, 734. In following the course of the law of nations, this Court has declared that even in cases of conquest, the conqueror does no more than displace the sovereign, and assume dominion over the country. 7 Peters, 86; (10 Peters, 720, 729-30, passim). "A cession of territory is never understood to be a cession of the property of the inhabitants. The king cedes only that which belongs to him; lands he had previously granted, were not his to cede. Neither party could so understand the treaty. Neither party could consider itself as attempting a wrong to individuals condemned by the whole civilized world. 'The cession of a territory' would necessarily be understood to pass the sovereignty only; and not to interfere with private property." Ib. 87. No construction of a treaty, which would impair that security to private property, which the laws and usages of nations would without express stipulation have conferred, would seem to be admissible further than its positive words require. "Without it, the title of individuals would remain as valid under the new government, as they were under the old; and those titles, at least so far as they were consummate, might be asserted in the courts of the United States, independently of this article." Ib. 88; 6 Peters, 741-2; S. P. 9 Peters, 133.

The terms of a treaty are to be applied to the state of things then existing in the ceded territory, 8 Peters, 462: in that which had been held by Spain, the whole power of granting and confirming titles had, by the royal order of 1754, been transferred to officers in the colo-

nies, the commandants of posts, and local authorities, who acted in their discretion as the sole judges of the manner, condition, or consideration, in, on, or for which they conferred the right of property, as officers and competent authorities, to exercise the granting power. Such officers were in all the colonies; they made grants of all grades of title, as well in rewards for services as favours, or for the benefit of the country, as they pleased; being persons authorized by the king to grant lands, " he was not willing to expose the acts of his public and confidential officers, and the title of his subjects acquired under those acts, to that strict and jealous scrutiny, whic a foreign government, interested against their validity, would apply to them, if his private instructions or particular authority were to be required in every case; and that he might therefore stipulate for that full (evidence) to the instrument itself, which is usually allowed to instruments issued by the proper officer." 8 Peters, 449–50, to 458, 475, 488–9; 7 Peters, 96; 9 Peters, 134, 169, 734; 10 Peters, 331; S. P. 6 Peters, 727, &c.; White's Comp. Sp. Laws, 218, 249. Such a grant under a general power, would be considered as valid, even if the power to disavow it existed until actually disavowed. 8 Peters, 451. No such disavowal has ever been known to the Court, in any of the numerous cases which have been before us, arising under the treaties of 1803 and 1819; and the assiduous researches of Mr. White have brought none to his knowledge. 8 Peters, 458; 10 Peters, 332; White's Comp. 9; from which it may be reasonably presumed that none exist.

Treaties are the law of the land, and a rule of decision in all courts. 2 Peters, 314; 9 Peters, 133. Their stipulations are binding on the United States; in that of 1819, there is a present confirmation of all grants made before January, 1818, with the exception of only three, which had been previously made, and were expressly omitted, on which this Court make these remarks. "While Florida remained a province of Spain, the right of his catholic majesty, acting in person or by his officers, to distribute lands according to his pleasure was unquestioned. That he was in the constant exercise of this right, was well known. If the United States were not content to receive the territory, charged with titles thus created, they ought to have made, and they would have made such exceptions as they deemed necessary. They have made these exceptions. They have stipulated that all grants made since the 24th of January, 1818, shall be null and void. The American government was content with the

security; which this stipulation afforded, and cannot how demand farther and additional grounds. All other concessions made by his catholic majesty, or his lawful authorities, in the ceded territories, are as valid as if the cession had not been made." 8 Peters, 463, 464; S. P., 9 Peters, 734; 6 Peters, 741–2; 7 Peters, 88. By the treaty of 1803, there was a stipulation inter alia, that the inhabitants of the ceded territory shall be maintained and protected in the free enjoyment of their liberty, property, and the religion they profess; as to which, this is the language of this Court.

"That the perfect inviolability and security of property is among these rights, all will assert and maintain." 9 Peters, 133; S. P., 10 Peters, 718, 722, 736. What was to be considered as property, under this stipulation, was, as held in the United States v. Smith, to depend on this question, " whether, in the given case, a court of equity could, according to its rules, and the laws of Spain, consider the conscience of the king to be so affected by his own, or the acts of the lawful authorities of the province, that he had become a trus-tee for the claimant, and held the land claimed by an equity upon it, amounting to a severance of so much from his domain, before the 10th of March, 1804, in Missouri, and the 24th of January, 1818, in Florida; the periods fixed by the law (of congress) in one case, and the treaty in the other." 10 Peters, 330, 331, 722, 36, S. P.

It is next in order to consider, what were the laws of Spain as to the disposition of the royal domain, in Louisiana, while she held it. By the royal ordinance of 1754, it is ordained, for the reasons set forth in the preamble; 1. That from the date thereof, the power of appointing sub-delegates for selling lands, and the uncultivated parts in the king's dominions, shall belong exclusively to the local au-thorities, being his officers in the colonies. 8 Peters, 451. 2. The officers to whom jurisdiction for the sale of lands shall be sub-dele-gated, shall proceed with mildness, gentleness, and moderation, with verbal, and not judicial proceeding, in the case of lands possessed by the Indians, or which they may require for labour, tillage, &c. 3. In regard to the lands of communities, and those granted to the towns for pasturage and common, no change shall be made; the towns shall be maintained in possession of them; those seized, shall be restored, and their extent enlarged according to the wants of the population; nor shall severe strictness be used towards those persons who are in possession according to the requirements of the laws. 4. Those who have been in possession of lands, by acts not con-

[Strother v. Lucas.]

firmed before 1700, may retain free possession thereof without mo-
lestation. If persons have not warrants, their proof of long posses-
sion shall be held as a title by prescription. If they have not
cultivated the lands, three months shall be given, or whatever time
may be thought sufficient; and notice shall be given, that if they fail
to cultivate the lands, they shall be given to those who shall lodge
information thereof, under the same condition of cultivating them.
White's Comp. 50, 51.

Towns may be founded on prescribed conditions, for which de-
finite rewards are given. White's Comp. 34, 59. The founder shall
contract to grant to each person who joins the settlement, building
lots and pastures, and lands for cultivation, proportionate to what he
will agree to improve. White, No. 62. A town containing ten mar-
ried men, with an extent of territory proportioned to what is stipu-
lated, may elect from among themselves, ordinary alcaldes, and offi-
cers of the council. White, No. 63. The territory granted to the
founder of a settlement, shall be thus distributed. They shall lay out
for the site of the town, whatever may be necessary sufficient *exidor*,
and abundant pasture for the cattle of the inhabitants, and as much
besides for that which shall belong to the town *proprias*. Of the ba-
lance of the tract, the founder to have one-fourth, and three-fourths
to be equally divided among the settlers. White, No. 66. The lots
to be distributed by lot among the settlers, beginning with those ad-
joining the main square, the remainder to be reserved to the king, to
give as rewards to new settlers or otherwise, at his will, and a plot of
the settlement to be made out. White, No. 67. Commons shall be
reserved, and the remainder laid out for cultivation, in tracts equal
in number to the town lots, to be drawn by lot. White, No. 70. If
accident should prevent the completion of the settlement in the term
prescribed, the settlers shall incur no forfeiture or penalty, and the
governor of the district may extend the term according to the cir-
cumstances of the case. White, No. 73. There shall be distributed
among the settlers of the villages, lots and lands, varying in size and
extent, according to their rank and merit, and after living and labour-
ing therein four years, they may sell them as their own property.
White, No. 74. No persons shall have lands in one settlement, if
they possess lands in another, unless they have left their former, and
removed to their new residence, or resided in the first for the four
years necessary to entitle them to the fee simple right, or have relin-
quished it for not having fulfilled their obligations. White, No. 75.

The lots shall be built upon, the houses occupied, the arable lands divided, cleared, worked and planted, and those destined for pasture, stocked within a limited time, or the grants shall be forfeited, with a penalty. White, No. 76. The distribution shall be made by the governors, under the advice of the council of the villages. White, No. 78, (Vide Document of 1772.) All to whom lands shall be distributed, shall, within three months, take possession, &c., under penalty of forfeiting the land, that it may be vacated and forfeited to some other settler; so as to the settlements and improvements they may hold within the villages. White, No. 81; (Vide also, 1 Partidas, 123; 2 Partidas, 338, 339, 373, 440.)*

* Definition of *regimiento, regidor, alcaldes,* &c. in the laws of the Spanish empire of the Indies.

In the administration of the laws, in civil and criminal matters, and the regulation of the police, the settled territories of the Spanish empire of the Indies were divided into a number of sections, differing in extent; over each of which was placed a royal officer, appointed for a limited period by the supreme council of the Indies. The larger sections were termed provinces, or more properly gobernaciones or governments, and were superintended by governors, who were also in many parts commandants and captains general, that is to say, exercising military and political sway. The sections of lesser extent, but often of great importance, from comprising some capital or other large city, were termed *corregimientos,* and their chiefs were called *corregidors.* The smallest or least important of these separate jurisdictions were placed under the direction of an *alcalde mayor.* In places in which resided an *audiencia,* or high court of justice, the president was sometimes the administrator in chief of the law and police.

The seats of administration, or capitals of these divisions, were generally the largest towns in them, from which the section in almost every instance took its name. In every capital of a jurisdiction, was a council called the *ayuntamiento* or *cabildo;* the ayuntamiento is, strictly speaking, the council, and the cabildo, the place of its meeting; the two words are, however, indifferently used to convey both significations. This municipal council was composed, in the first place, of a number of *regidores,* never exceeding twelve, who composed the *regimiento;* the office of *regidor* was held for life; that is to say, during the pleasure of the supreme authority; in most places it was purchased; in some cities, however, the *regidores* were chosen by persons of the district, who were allowed to vote, and were styled *capitulares.* In places in which no governor resided, the regidores chose for two years, one or two persons who were not in the employ of the government, as *alcaldes ordinarios,* or magistrates who held their courts and administered justice in all the cases in which a governor could decide; they had seats and votes in the ayuntamiento, except when a governor or corregidor happened to be present. The chief of the district had a seat, but no voice in the ayuntamiento; the standard bearer, or *alfarez,* had of right a pre-eminent place and a vote.

Thus the ayuntamiento or cabildo consisted of the governor, corregidor or alcalde mayor of the place, the alfarez, the alcaldes ordinarios, and the regimiento, or body of regidores.

The word syndick does not appear in the recapilacion or official compilation of the

[Strother v. Lucas.]

For the purpose of ascertaining what lands belonged to the king, it was ordered that the owners of land should exhibit to the officers

laws of the Indies. The Spanish dictionary of the academy, and the French authors on jurisprudence, agree in defining it to mean the person charged with the care, defence, and advancement of the interests of a community. In France, at present, the trustee who holds the property of a bankrupt, is styled *le syndic*.

With regard to the words *propios* or *proprios*, *exidos* or *egidos* and *depesas*.

When a town was founded in Spanish America, certain portions of ground termed propios, were laid off and reserved as the unalienable property of the town, for the purpose of erecting public buildings, markets, &c., or to be used in any other way, under the direction of the municipality for the advancement of the revenues or the prosperity of the place. There were also reserved in the vicinity, certain spaces of ground for commons or public pasturage, which were called depesas: and vacant spaces for exercise, and for thrashing corn or other general uses, called exidos. The difference between the propios on the one hand, and the depesas and exidos on the other, was that the latter were intended for specific purposes, and could not be appropriated to any others; while the municipality might convert the propios to the uses which it should judge most convenient.

With respect to the measures of ground called *fanegas* and *huebras*.

The dictionary of the Spanish academy, the highest authority on the mere signification of words in that language, defines a fanega to mean as much ground as a fanega (a measure equivalent to a little more than a bushel and a half) of wheat will serve to sow; adding that it is generally considered equal to four hundred estadales (or spaces of eleven Spanish feet) square. Kelly, in his Cambist, makes a fanega or fanegada equal to five thousand five hundred square yards, or about an acre and a third.

The huebra is designated by the same dictionary as being as much ground as two oxen can plough up in a day.

On the subject of caballerias and peonias, I can only give my translation of the law defining them.

*Translation of Law 1st, Title 12th, Book 4th, of the Recapilacion de Leyes de Indias. Madrid; 1781.*

That lands and lots are to be given to new settlers and Indians to be assigned to them; and what are meant by *peonia* and *caballeria;* D. Fernando V. in Valladolid, June 18, and August 9th, 1513, Chap. I. The emperor, D. Carlos, on the 28th of June, 1523, and in Toledo on the 19th of May, 1525. D. Philip the Second, in his chapter of Instructions at Toledo, May 25th, 1596.

In order to encourage our vassals in the discovery and settlement of the Indies, and that they may live with that comfort and convenience which we desire [for them]: It is our will, that houses, building-lots, lands, caballerias and peonias may be and shall be assigned to all who may go as settlers of new lands in the villages and towns to which they may be directed by the governor of the new settlement, making a distinction between gentlemen of family, and labourers, and those of lesser degree and worth; and that these [houses, &c.] may be increased in extent and in quality, according to the services of such settlers, in order that they may attend to the cultivation of the soil, and to raising of cattle; and after they shall have dwelt and laboured on these [houses, &c.] and resided in the said settlements four years, we grant them power, thenceforward, to sell and otherwise use them, agreeably to their own will as their

appointed for the purpose their titles to lands, estates, huts, and cabellerias; who, after confirming the possession of such as hold the same by virtue of good and legal titles, or by a just prescription, shall restore the remainder. No. 84. Officers were ordered not to alter the acts of their predecessors with regard to lands admitted to composition, and to leave the holders thereof in quiet possession; and those who have encroached, and held more than they are entitled to, shall be allowed to pay a moderate composition, and new titles shall be issued to them. Where titles to land have been issued by officers who were not authorized, and have been confirmed in council, the holders of letters of confirmation are ordered to retain them, that they may be confirmed in their possession within the limits prescribed; and, as regards their encroachments beyond the limits, they are entitled to the benefits of this law. No. 85.

Those things which the king gives to any one, cannot be taken from him by the king, or any one else, without some fault of his; he shall dispose of them at his will, as of any other things belonging to him. White, 82, No. 11. When the justices and regidores of a

own property; and likewise agreeably to their quality, the governor or whoever may hold our faculty, may [or shall] assign Indians to them, in the distribution which he may make, in order that they may avail themselves of the term of service, and the proficiencies of such Indians, according to the rates and rules established.

*The same Ordinance* 104, 105 *and* 106, *on the subject of Settlements.*

And as it may possibly happen that in the assignment of the lands there may be doubts with regard to measures: We declare that a peonia comprises a lot fifty feet wide, and a hundred long; a hundred fanegas of land for cultivation of wheat or barley; ten of Indian corn; two huebras of land for a garden, and eight for planting other trees growing in drier land; pasture ground for ten breeding sows, twenty cows, five horses, a hundred sheep, and twenty goats. A caballeria is to consist of a lot one hundred feet wide by two hundred long, and in all other respects equal to five peonias; that is to say, five hundred fanegas of ground for cultivation of wheat or barley, fifty of Indian corn; ten huebras of land for garden; forty for other trees growing in more barren land; pasture ground for fifty breeding sows, a hundred cows, twenty horses, five hundred sheep, and a hundred goats. And we order, that the assignment be made in form, so that all may participate in the good and the middling, and in that which is neither, as regards the portion to be allotted to each.

According to the dictionary of the Spanish academy, a peonia means the portion granted to a foot-soldier of spoils taken, or lands conquered in a war; and a caballeria is a portion granted on such occasions to a horse soldier. By the above law it would seem, that gentlemen or persons entitled to bear arms (escuderos) were to be allowed the share of a horseman, and persons of lower degree were to share as foot soldiers. The fanega appears to be strictly a measure, without any reference to the quantity of seed to be sown on the ground; and so does huebra.

city, town, or village, have made, and continue to make ordinances for their officers and functionaries, and superintendents of the limits and commons in the country, as for other matters which are of the resort of the judiciary and regidores, (or capitulores,) the auditors and alcaldes are not to interfere therein, except by appeal, and in case of damages. White, 83. No grants shall be made of the rights, revenues, or municipal domains of villages; and all grants thereof made by the king, shall be void. Ib. Vide, 10 Peters, 720, 24, &c. There shall be commissioners in each village, to superintend the affairs thereof connected with the municipal taxes and domains, and the management thereof, to be composed of alcaldes and regidores; and, if thought proper, of the general attorney and recorder, (Procurado Sindico General.) Where there are no municipal taxes, these commissioners shall attend to the best management of the municipal domains; and where there are such taxes, of both. White, 88. The superintendent of the settlement shall select the tracts, and locate the houses of the settler; if any part of the tract belonging to the settlement is proper for irrigation, it shall be proportionably distributed; each settler shall open the channels for irrigation, and contribute equally to their repairs. White, 105. Landmarks shall be erected between each lot, trees planted along the dividing line, a record of distribution among the settlers shall be made, containing the number of tracts, the names of the settlers to whom allotted, giving each a sheet or plot of his tract, which shall be his title in future, to remain in his possession, to be consulted without the necessity of resorting to the record itself. White, 106, pp. 40. No. 81.

These are some of the many royal orders which relate to the general domain of the king, and to settlements or villages, in each of which there were municipal councils and officers, who made and executed their regulations of police. 10 Peters, 723, 4. One branch of which was confided to a syndic regidore, or other supervising officer, to enforce the village ordinances. White, 108, 9, 10, 11, 12, 13, 15, 16. These, with the regulations of the local officers of the king, composed the written law of the colony or village, accordingly as the subject matter thereof was general or local; besides which, there was an unwritten law of three kinds. "Use, custom, and the common law." Use is defined to be "that which has arisen from those things which a man says and does, and is of long continuance, and without interruption;" the requisites to the validity of which are prescribed. "Custom is the law or rule which is not written,

and which men have used for a long time, supporting themselves by it in the things and reasons with respect to which they have exercised it; on which definition are founded three axioms."

1. "That custom is introduced by the people, under which name we understand the union or assemblage of persons of all description, of that country where they are collected. 2. That it derives its authority from the express or tacit consent of the king. 3. That once introduced, it has the force of law. To establish a custom, the whole, or greater part of the people ought to concur in it. Ten years must have elapsed among persons present, and twenty at least among persons absent. In default of this continuance, it shall be proved by two sentences of judges, or judgments given upon or according to it; one sentence suffices, when given on a question whether that custom exists, and the judge determined that it did." Customs are general, or particular; the latter respects a specific thing, a particular person, or place; or with respect to the whole, of certain persons or places; general, with respect to specific acts of all the inhabitants of the kingdom, and may destroy the law; but a particular custom in any province or seignory, has only this effect in that district or part where it hath been exercised. "A fuero (forum,) is an use and custom combined, and has the force of law." White, 60, 1.

Such are the laws, usages, and customs of Spain, by which to ascertain what was property in the ceded territory, when it came into the hands of the United States, charged with titles originating thereby; creating rights of property of all grades and description. In the treaty of cession, no exceptions were made, and this Court has declared that none can thereafter be made. 8 Peters, 463. The United States must remain content with that which contented them at the transfer, when they assumed the precise position of the king of Spain. The United States have so remained, as appears by their laws. By the acts of 1804, 2 Story, 939; of 1805; Ib. 966, of 1807; Ib. 1060, 62, of 1816; Ib. 1604; they recognised the laws, usages, and customs of Spain, to be legitimate sources of titles; and, by the act of 1812, 2 Story, 1257, confirmed to the inhabitants of St. Louis, and other villages, according to their several right or rights of common thereto, the rights, titles, and claims to town or village lots, out lots, common field lots, and commons, in belonging or adjoining to the same; which titles depended on parol grants and local customs.

The same recognition extended to grants to actual settlers, pursuant to such laws, usages and customs; to acts done by such settlers

[Strother v. Lucas.]

to obtain a grant of lands actually settled, or persons claiming title thereto, if the settlement was made before the 20th December, 1803. Such claims when made in virtue of a warrant or order of survey, or permission of the proper Spanish officer, were confirmed, if actually inhabited and cultivated on that day, 2 Story, 966; and the permission shall be presumed, on proof of a continued habitation and cultivation for three years prior to the 1st October, 1800, though the party may not have it in his power to produce sufficient evidence of such permission. Ib. 1018. Thus connecting the law of nations, the stipulations of the treaty, the laws, usages and customs of Spain, the acts of congress, with the decisions of this Court; we are furnished with sure rules of law, to guide us through this and all kindred cases, in ascertaining what was property in the inhabitants of the territory, when it was ceded. As all the supreme laws of the land, the constitution, laws and treaties, forbid the United States to violate rights of property thus acquired, so they have never attempted it; but the state of the province required that some appropriate laws should be passed, in order to ascertain what was private, and what public property, to give repose to possession, security to titles depending on the evidence of facts remote in time, difficult of proof, and in the absence of records or other writings. These facts, too, on which the law of usage and custom, the transmission of property by parol, the performance of acts in *pais*, on which the right depended, were to be developed from the few survivors of the settlers of an ancient village, of whom, as appears from the record, but few could read or write: whose occupations were in the trade with Orleans, Machinau, and the Indian tribes, who attended little to village concerns, and still less to village property, when, on a public sale, its price was eight cents an arpent; and what would now be a splendid fortune, would not, fifty years ago, be worth the clerk's fee for writing the deed which conveyed it, and was therefore passed from hand to hand by parol, with less formality than the sale of a beaver skin, which a bunch of wampum would buy. The simple settlers of St. Louis then little thought that the time would ever come, when under a stranger government, the sales of their poor possessions, made in the hall of the government, at the church door after high mass, entered on the public archives, as enduring records of their most solemn transactions, would ever be questioned by strict rules of law or evidence. Still less did such a race of men, as the boatmen and hunters of the west, who by mutual agreement gave one thing, and took another, whether

land or peltry, on a fair exchange by a shake of the hand, ever imagine that a common field lot would ever be worth, when lying waste, a pack of furs, or that no evidence of its sale would be admissible, on a question of whose it was, unless by deed. When there was but one Kiersereau and one Gamache in the village, it was little dreamed of that a principality in value, would depend for its ownership on the question, whether the one wrote his name Kirceraux or Kirgeaux, or to the mark of the other was affixed the name Joseph Batis, or J. B. Gamache. Well was it said by one of the witnesses at the trial, "there were few people; it was not as it is now." Record, page 88.

Congress, well aware of the state of the country and villages, wisely and justly went to the extent, perhaps, of their powers, in providing for the security of private rights, by directing all claimants to file their claims before a board, specially appointed to adjust and settle all conflicting claims to lands. They had in view another important object; to ascertain what belonged to the United States, so that sales could be safely made; the country settled in peace, and dormant titles not be permitted either to disturb ancient pos.es-sion: to give to their holders the valuable improvements made by purchasers, or the sites of cities, which had been built up, by their enterprise; vide 10 Peters, 473. Accordingly we find, that by various acts, the time of filing such claim is limited; after which they are declared void, so far as they depend on any act of congress; and shall not be received in evidence in any court, against any person claiming by a grant from the United States. 2 Story, 968, 1061, 1216, 1260, 1301.

These are laws analogous to acts of limitations, for recording deeds, or giving effect to the awards of commissioners for settling claims to land under the laws of the states; the time and manner of their operation, and the exceptions to them, depend on the sound discretion of the legislature, according to the nature of the titles, the situation of the country, and the emergency which calls for their enactment. Reasons of sound policy have led to the general adoption of laws of both descriptions, and their validity cannot be questioned. Cases may occur, where the provisions of a law may be such as to call for the interposition of the courts; but these under consideration do not. Vide 3 Peters, 289–90. They have been uniformly approved by this Court, in 12 Wh. 528–29, 537–39–43, 601–2; 6 Peters, 771–72; 7 Peters, 90 to 93, passim; and ought to be

[Strother v. Lucas.]

considered as settled rules of decision in all cases to which they apply.

Having reviewed the written law of the case, we must next examine what was the unwritten law of the place, which can appear only from the evidence in the record, as to the usage, custom or fuero, and is most manifest. 1. In the most solemn act of 1772, by the two governors, in the presence of all the officers of government, the people of the village, and recorded together with all proceedings under it at large, in the land book of the district, with the surveys entered on sixty-eight pages. What those proceedings were, will appear in the document before referred to in general, and the copies from the entries in the land book, in relation to each lot, contained in the record. 2. In the deeds executed in the presence of the governor, and witnesses of assistance specially selected to attest the sale; as by the common law they were called to attest the livery of seisin on a feoffment, 8 Cr. 244, &c.; and the entries of the names of the purchasers in the margin of the survey of the property sold, recorded in the land book of the village.

3. In the adjudications made by the governor in a judicial capacity, making a sale of the property of Chancellier and St. Cyr, by judicial process, set out at length in the record, and most solemnly attested.

4. By the evidence in the record, showing beyond doubt, that there has been an universal acquiescence by the political authorities of the district; the municipal council and officers of the village, as well as the inhabitants, in all these acts, testified by the quiet possession held under them from 1772. The document of that year is not only to be considered as the ancient muniment of the titles of the villagers, but as an authentic and conclusive recognition of the local custom, in relation to some important facts, illustrating the local law of the place, when taken in connection with the testimony of the witnesses.

In that solemn act there is this clause, "to serve to designate the various tracts of land, granted in the name of the king (of Spain) to the inhabitants of this post of St. Louis, as well by title (deed) as by verbal consent, by the chiefs who have governed them from the foundation (of the government) to this moment.". In alluding to acts done under the governor of the territory under France, is this clause; "the latter to certify by his signature, in his said quality, and in virtue of the power confided to him, that he had granted, either by title,

(deed) or verbally, the abovementioned lands in the name of his majesty" (the king of France):

This attests the meaning of the word *grant*, under both governments, to be inclusive of verbal ones, which were equally valid as those by deed; and as the title passed from the king to the people in this way, so we find by the uncontradicted testimony of several witnesses, that it passed from one to another in the same way, without writing, when the land was of small value. It appears, also, from the evidence, that there was an officer in the village, called by the inhabitants a *syndick*, and in the Spanish laws a *regidore;* whose duty and authority were, to see that the common fences of the forty arpent lots were kept in repair. He would direct them to be inspected; and if they were found out of repair, would direct the owner of the lot, in front of which it was defective, to make the repairs: if the owner was on a journey, the *syndick* would have the repairs made, and make the owner pay his share on his return; otherwise he would give the land to another person, who would make the share of the fence.

This was a regulation in villages, by the authority of the commandant and municipal authorities, in conformity with the laws of Spain; vide 10 Peters, 725, 31; it applied as well to village property as to the large grants of the royal domain; and it appears by the regulations of O'Reilley, Gayoso, and Morales, that from 1770 till the cession in 1803, it was of universal application throughout Louisiana. White, 205, to 216, passim.

Such were the laws, usages and customs of Spain, in relation to the grants, transfers and tenure of village property. There remains one other rule which must be applied to this case, unless the evidence in the present record, which was not in the former, may lead to a different result; we mean the opinion of this Court, in the case between the same parties, claiming the same property. Vide 6 Peters, 763, 7.

Before we consider the instructions on which the plaintiff has assigned his errors, the points decided in that case will be taken in the order of the learned judge, who delivered the opinion of the Court.

1. On the handwriting and identity of Rene Kiersereau, who, as alleged, was one of the witnesses of assistance to the deed of 1781, from M. M. Robillar, his wife, to Louis Chancellier, as to which the court below had rejected certain depositions, which was assigned for error; and the objection overruled, for this reason: "The record

does not show that the judge was called upon to express any opinion, with respect to the legal effect and operation of the deed; or that the plaintiff had not the full benefit of its being his (Kiersereau's) deed. And, indeed, it would seem from the course of the trial, that it was so considered; or, at all events, the contrary does not appear from any question presented to the Court on the subject." 6 Peters, 768. Had the same question been presented now, as it was then, we should not have hesitated to have expressed an entire concurrence with that view; but as it now comes up on a new state of facts, it deserves further consideration; especially as a similar question occurs. as to the identity of Gamache, who conveyed to St. Cyr in 1793. Both questions are so similar, that they may be taken together in two aspects. 1. As questions of fact. 2. Of law.

1. It is admitted that Rene Kiersereau was the owner of one of the lots in controversy, as is apparent on the document of 1772, to which his name is affixed as one of eleven inhabitants, including the governor, the political and municipal officers of the village, who could write their names, which, according to evidence, contained two hundred and fifty persons. Whether he was the same person who was the witness to the deed from his wife, and (as we shall assume,) the grantor of the lot, was a pure question of fact for the jury, on the whole evidence on that subject; so it was as to the identity of Gamache, as to whom there is the following admission on the record. "It was also admitted, that Joseph Gamache, for whom the survey of one of the tracts of land, of one by forty arpents, was made, was known as well by the name of Jean Baptiste Gamache, and of Baptiste Gamache, as Joseph Gamache;" which also appears by his deed to Chancellier. Mark ⋈ of John Baptiste Gamache, Joseph Gamache, in the survey in the land book. Batis ⋈ Gamache in his deed to St. Cyr, and Baptiste Gamache, in the margin of the survey.

Before the court could give any instruction to the jury, as to the identity of either Kiersereau, or Gamache, "they must have been satisfied on that subject, that there was nothing in (the parol) evidence, or any fact which the jury could lawfully infer therefrom," that they were or were not the owners of the respective lots. If there was any evidence which conduced to prove the fact, "the Court must assume it to have been proved; for it is the exclusive province of the jury to decide what facts are proved by competent evidence," to judge of the credibility of the witnesses, and the weight of their testimony, as tending more or less to prove the fact relied on. "As

these were matters with which the court could not interfere, the right to the instruction asked, must depend on the opinion of the court, on a finding by the jury in favour of the defendant, on any matter which the evidence conduced to prove, giving full credence to the witnesses produced by him, and discrediting those of the plaintiff. Ewing v. Burnett, 11 Peters, 50, 51, 52; S. P. U. S. v. Laub, 1838, 12 Peters.

2. In this case, we think that neither question was one of fact entirely; the manner in which the deeds were executed, the possession taken and held under them by Chancellier, of one; and St. Cyr, of the other; its notoriety to the authorities, and the people of the village, with the nature of the possession, the situation and state of the common field lots, and their cultivation within one common enclosure, regulated by a special police, with the other circumstances of the case; Vide 11 Peters, 523; incline us strongly to this conclusion. That after this lapse of time, the legal presumption of the validity of both deeds, would attach by the maxim, that in favour of long possession and ancient appropriation, every thing which was done shall be presumed to have been rightfully done; and though it does not appear to have been done, the law will presume that whatever was necessary, has been done. 2 Peters, 760, and cases cited.

The next point decided in the former case, was on an objection made by the defendant's counsel, that the plaintiff had not such a legal title as to sustain an ejectment; which was overruled. 6 Peters, 768, 69. And we think very properly, in accordance with the leading case of Simmes' Lessee v. Irvine, 3 Dall. 425, 54; the authority of which remains unquestioned. It was objected that the confirmation by the board of commissioners to Choteau, was void, because the defendant was at the time one of the board, and claimed the property by a deed from Choteau, before the confirmation; it was overruled, because it did not appear that he sat at the board at the time. Ib. 768. The same objection has been much pressed now; with the additional reason, that the defendant was also a judge of the superior court of the territory; but as the confirmations in the record show that he was not present, and we think the objection not good in law, we fully concur with the decision of this point in the former case.

After recapitulating the evidence as it appeared in the then record, the court observed: "From this statement of the case, according to the plaintiff's own showing, there is a regular deduction of title or claim from the persons for whom the lots were surveyed to the de-

fendant. But it appears that these persons, Kiersereau and Gamache, sold their claim twice; (Gamache one-half) in the first place, to Louis Chancellier, under whom the plaintiff claims; and in the second place to St. Cyr, under whom the defendant claims. If these title papers were to be considered, independent of the acts of congress, and the proceedings of the commissioners, the plaintiff being prior in point of time, would prevail so far as depended upon the deduction of a paper title, and independent of the question of possession.

"It becomes necessary, therefore, to inquire how far the acts of congress apply to, and affect any part of these title papers." The Court then, referring to the acts of 1805 and 1807, and to the evidence, held, that as there was no evidence that Madame Chancellier had ever filed her claim, or the evidence thereof, pursuant to the law, and the instruction of the court complained of, was on the effect of the confirmation under the law; the plaintiff could derive no benefit from it; 6 Peters, 772; which we think was the correct result of the then case. A different case is now presented on this subject.

The plaintiff gave in evidence two opinions of the recorder of land titles of St. Louis county, confirming to the representatives of Gamache and Kiersereau the forty arpent lot of each, and directed each to be surveyed; but did not offer the confirmations to Choteau by the board of commissioners, which were given in evidence by the defendant. The plaintiff claimed under the former, the defendant under the latter; that of the plaintiff will be first considered.

By the 8th sec. of the act of 1812, 2 Story, 1260, the recorder of land titles was invested with the same powers, and enjoined to perform the same duties, as the board of commissioners, (which was then dissolved,) in relation to claims which might be filed before the 1st December, 1812; and the claims which have been heretofore filed, but not acted on by the commissioners; except that all his decisions shall be subject to the revision of congress. He was directed to report to the commissioner of the land office, a list of all such claims, with the substance of the evidence in support thereof, his opinion, and such remarks as he may think proper, to be laid before congress at their next session. By the act of 1813, the time for filing claims was extended to 1st January, 1814. 2 Story, 1306, 1384–5, under which acts the recorder made the confirmations relied on by the plaintiff on the 1st November, 1815, which was confirmed by the 2d sec. of the act of 1816. 3 Story, 1604. But these confirmations cannot avail the plaintiff as a claimant under these or any other acts

[Strother v. Lucas.]

of congress, for the following reasons: 1. That the authority of the recorder of land titles was, by the express terms of the acts of 1812 and '13, confined to those claims on which the board of commissioners had not previously acted; from which it follows, that after the commissioners have made a confirmation of a specific claim, the action of the recorder is either merely cumulative, and so inoperative; or if adverse, merely void, as an assumption and usurpation of power in a case on which he had not jurisdiction, and his action must be a mere nullity. Here the commissioners had decided on the identical claim in 1809–10; congress had made a general confirmation of all the claims of the then inhabitants of St. Louis, of their title to the common field lots in 1812, when the defendant was an inhabitant thereof, and in actual possession of those in controversy; and by the act it was *provided*, that it should not affect any confirmed claims to the same lands. Surveys were directed to be made, plots thereof made out, and transmitted to the general land office and recorder of land titles. 2 Story, 1257–8. As the act directed no further steps to be taken, the title became complete, and the recorder thenceforth ceased to have any power over the confirmed lots, save to perform the ministerial acts directed by law, as the ordinary duties of his office. If congress could, it never did give him any authority to supervise either the acts of the commissioners, or the confirmations of the law.

2. We must, then, take the defendant, as one holding the premises in controversy, by a grant from the United States, and as their grantee, entitled to all the protection of the laws appropriate to the case. The unanswerable reasoning of this Court, in Green v. Liter, the principles of law on which it is founded, with the admitted authority with which it has been received, save the necessity of any reference to any other source for its support. 8 Cr. 244–49. That a grant may be made by a law, as well as a patent pursuant to a law, is undoubted, 6 Cr. 128; and a confirmation by a law, is as fully to all intents and purposes a grant, as if it contained in terms a grant *de novo*. The plaintiff, therefore, is brought within the two provisions of the laws; that by Madame Chancellier not having filed her claim within the time limited by law, she could not set up any claim under any act of congress, or be permitted to give any evidence thereof in any court, against a person having a grant from the United States, under the confirmation of the commissioners, and the act of 1812. The plaintiff has contended, that the act of 1831 has released him

from these provisions, and all penalties imposed by any act of congress. This act was a supplement to the act of confirmation of June, 1812; 2 Story, 1257–8; by the first section of which the titles of the inhabitants were confirmed according to their private right or rights, in common thereto, as has been stated before. By the 2d section, all town, out, and common field lots, included in the surveys, therein directed, not rightfully owned or claimed by any individual, or held in common, belonging to the towns or villages, or reserved by the president for military purposes, were reserved to the towns and villages for the support of schools. In order to ascertain what lots were owned or claimed by individuals, the recorder was by the 8th section empowered to act on claims filed before 1st December, 1813, as has been seen, and those before filed and undecided. The time for presenting such claims was further enlarged by the acts of April 1, 1814; 2 Story, 1410, 1429–30; and certain confirmations were made by congress in those acts. Under this authority the recorder made his report, which appears in the 3d vol. State Papers—Public Lands, p. 314. His proceedings were confirmed by the 2d section of the act of April, 1816; 3 Story, 1604–5. Then comes the act of 1831, the first section of which enacted, "That the United States do relinquish to the inhabitants of St. Louis, &c., all their right, title and interest, to the town or village lots, out lots, common field lots, and commons in, adjoining, or belonging to the towns and villages, confirmed to them, respectively, by the act of 1812; to be held by the inhabitants in full property, according to their several rights therein, to be regulated or disposed of for the use of the inhabitants, according to the laws of Missouri." By the second section, the United States relinquished their right, title, and interest, in and to the town, out, and common field lots, in the state of Missouri, reserved for schools by the act of 1812; and provided that the same shall be sold or disposed of, or regulated for the same purposes, in such manner as may be directed by the legislature of the state. 4 Story, 2220. It is most obvious that this act, so far from opening the confirmation of the commissioners, in 1809–10, and of the act of 1812, or relieving the plaintiffs from the effect thereof, is a new confirmation of the private and common rights of the inhabitants, and cannot aid the plaintiff; the purposes of this case do not require us to give it any further consideration. For these reasons, we feel constrained to come to the same conclusion on this record, which the Court did on the former; the plaintiff can neither have any benefit from any act of congress, or

give evidence of his claim, against the defendant, claiming by grant from the United States.

The next position of the Court in the former case was, that Madame Chancellier having slept upon her claim till 1818, must be considered as having abandoned it; to which we not only entirely assent, as this point appeared then, but as still clearer now, by the new evidence. It was testified at the trial, that Madame Chancellier had made a verbal sale of the two lots to St. Cyr; the credibility of the witness, and the weight of his testimony, were matters exclusively for the jury; and we cannot say that they did not find for the defendant on that ground; it was competent evidence, conducing to prove that fact; and if the jury found the fact accordingly, we have only to consider its consequences. Assuming, as we must, that the fact of such sale is established, it is immaterial whether such sale passed the title or not; it was, when taken in connexion with the other circumstances of the case, powerful if not conclusive evidence, that she had abandoned as well the possession as the right to the lots in controversy, without the intention to reclaim either; that St. Cyr took and held possession in good faith, and with good faith purchased from Kiersereau and Gamache, which he might lawfully do to complete his title. If it was a fact, then the continued possession of St. Cyr and the defendant, entitled the latter to all the benefit of the Spanish law of prescription, whether of thirty, twenty, or ten years, according to the rules laid down, as taken from the Recapilacion and Partidas, in White, 68–9. The destruction of the common fence of the common field lots, in 1798–9, was a sufficient excuse for St. Cyr or Choteau, not continuing the actual possession and cultivation of their lots, until the other owners would join in rebuilding the fence. The change of government in 1804, with the consequent uncertainty of titles, was a reason for leaving the lots open, which ought not to be overlooked; that there was no actual or intended abandonment by St. Cyr, might well have been found by the jury, from the judicial sale to Choteau in 1801; or by him, from the sale to the defendant in 1808. On these facts, the laws of Spain would consider the possession as continued, from 1798 to 1808; and if the opinions of this Court have any bearing on the question of possession, abandonment, or legal presumption of a rightful title, those to be found in Green v. Liter, 8 Cr. 244, &c.; Barr v. Gratz, 4 Wh. 213, 233; Pr. Soc. v. Pawlett, 4 Peters, 480, 504–6; Clark v. Courtney, 5 Peters, 354–5; Barclay v. Howell, 6 Peters, 513;

[Strother v. Lucas.]

U. S. v. Arredondo, ib. 743; Ellicott v. Pearl, 10 Peters, 442; Ewing v. Bernet, 11 Peters, 51-3; U. S. v. Mitchell 9 Peters, 734-5, 760; New Orleans v. The U. S. 10 Peters, 718-19, &c. are most full and conclusive.

The plaintiffs have relied much on the allegation, that St. Cyr took possession as the tenant of Madame Chancellier, or her husband, Beauchamp, in 1788, or under an agreement that he should keep up the fence while he occupied the lots. The only evidence of this fact was by her in her testimony, in which she stated it in general terms: on her cross-examination, she stated that Beauchamp had told her so; whereupon, the court directed the jury to reject her evidence. Whether the jury did so, or not, is not material; they were not bound to credit her; they might not believe her; and we cannot presume that they did, or hold that they ought. 11 Peters, 50, 51.

There is another fact in evidence, which leads to the same results. It was testified at the trial, that St. Cyr was put into possession by the syndic, pursuant to the village regulations, because the fence had not been kept up after the death of Chancellier. The jury were the judges of this fact; and from their finding, we must presume that it was proved, and hold the law to be accordingly; that no taint of bad faith can attach to the conduct of St. Cyr, by any notice he may have had of the title or claim of Madame Chancellier; it was consistent with her title, that she should hold it by the established village tenure, subject to the municipal, regulations, which were authorized by the laws, usages, and customs of the country and place. It is evident, that the law which gave a title in fee to a village lot, by a continued residence of four years in a house, neither did or could apply to a common field lot, used only for cultivation or pasturage, the owner of which could derive no advantage from his mere right of property, if the adjoining owners did not keep the common fence in repair, or pay the syndic for doing it. That such regulations were authorized by the written law of Spain, in royal orders, and by the unwritten law of *use, custom* and *fuero*, has been seen; and that such usages and customs were valid; that local usage and custom, in relation to municipal regulations, was not the law of the villages only, but of the metropolis of the province, and equally binding as the local law; is clearly established by the able and unanimous opinion of this Court, in New Orleans v. The United States, 10 Peters, 712, 716, 724, 730, 731.

Another principle laid down by the Court in the former case,

meets our entire approbation; " that the justice and law of the case, growing out of such a length of possession, are so manifestly with the judgment in the court below, if we look at the whole evidence on the record, that we feel disposed to give the most favourable interpretations to the instructions of the court." 6 Peters, 772.

There remains but one other point, on which the Court gave their opinion in the former case, which was then made by the plaintiff's counsel in their argument, and has been strongly urged in this case, that the confirmation of the commissioners enured to plaintiff's use.

The reasons assigned for this position are, that the only object of the acts of congress being to ascertain what property had been acquired by individuals before the cession, the commissioners were to act only on original claims, and by confirming the right of the original owner, to leave the derivative right under him entirely open between adverse claimants. The Court were before of opinion that this view of the case could not be sustained; and we are now of opinion, that it is inconsistent with all the acts of congress, which have organized boards of commissioners for adjusting land titles, the proceedings of the board, and the laws which have confirmed them.

By these laws it is provided, that the *original grant* shall be recorded; but *all other conveyances and deeds* shall be deposited with the register or recorder of deeds, to be by them laid before the commissioners. Vide 2 Story, 967, 968. The same provision is contained in the numerous laws on this subject, which are noticed and reviewed in the opinions of this Court; 12 Wheat. 525 to 543; 6 Peters, 718, &c.; 7 Peters, 89, 90, &c.; showing that this distinction between the evidence of original and derivative rights to land, has been uniformly observed by congress, and the Court. The confirmations of the commissioners in the present case are to the person who made and proved his claim before them; and from the reports of all the boards, as published in the State Papers,—Public Lands, 3 vol. passim; it has been uniformly done, and the acts of congress, confirming them, have been in general terms of reference to such reports. Vide 2 Story, 1410, 1430; 3 Story, 1604. It would defeat the whole object of these laws, and introduce infinite public mischief, were we to decide that the confirmations by he commissioners and congress, made expressly to those who claim by derivative titles, did not operate to their own use.

It has been seen, that the confirmation of titles to village lots in Missouri, 2 Story, 1257, 1258, is, in express terms, " to the inhabi-

tants of the village," according to their ".several right or rights in common thereto." So in the act of 1831, the lots confirmed by the act of 1812, are " to be held by the inhabitants of the said towns and villages in full property, according to their several rights therein." These laws necessarily admit of but one construction; and if we regard their terms, the object manifest on their face, and the effects evidently intended by congress, the position of the plaintiff's counsel is utterly untenable.

We now proceed to consider the instructions asked by the plaintiff and refused by the court, as well as those given as modifications of those asked by plaintiff, and those given by the court on the prayer of the defendant.

Plaintiff's instructions.

1. That the sale, partition, and final decree, relative to the estate of Chancellier, established the title of his wife to the premises in controversy, which the court refused; but instructed the jury, that they passed the title thereto, such as it was, vested in Chancellier, to her; to which we think there can be no well founded objection, as no law was produced by which such a decree could operate as a new grant of a right of property to the vendee. If none existed in the person as whose estate it was so sold, it was a transfer of an existing title; and not in its nature or effect an original grant.

2. That independent of the title of Kiersereau and Gamache, there was sufficient evidence before the jury to establish a title by prescription in Chancellier and his heirs; which instruction could not be given without usurping the province of the jury to decide on the sufficiency of the evidence. 9 Peters, 445. No instruction was asked as to its competency; and the one asked, was, therefore, properly refused.

3. That St. Cyr took no title by prescription. This was a mixed question of law and fact: to have given such instruction would have been an assumption by the court, that there was no such fact legally inferrible from the evidence, which would have brought St. Cyr within the law of prescription. There was not only evidence of such facts given to the jury, but from their finding, we must take the parol sale by Madame Chancellier to him, the usage and custom of the village, to authorize the syndic to put him in possession; and that he was, pursuant thereto, so put into possession, to be facts which would give to his possession the protection of prescription.

4. If the jury are of opinion that St. Cyr had notice of the sale to Madame Chancellier, his possession could not be adverse, or an estate in him by prescription. If St. Cyr purchased from her, or was put into possession of the lots on account of her default in not repairing the fence, a notice of her claim was a matter of course, and could not impair his right by possession, or the subsequent purchase from Kiersereau and Gamache.

5. That if St. Cyr was a purchaser at the sale of Chancellier's estate, or put his name or mark as such on the margin thereof, these facts are prima facie evidence, that he had notice of her title; to which the court answered, that this was proper evidence for the jury to consider, in deciding whether he had notice, and refused the instruction as asked; which we think was correct. But on the facts referred to under the third instruction, notice was wholly immaterial, as it could not taint his purchase with fraud.

6. That the deed from Kiersereau to St. Cyr, in 1793, who had before conveyed to Chancellier, by deed on record, conveyed nothing to him, and that the penalties of the crime of *estellionato*, by the Spanish law, were thereby incurred. 7. The same objection is made to the deed to St. Cyr from Gamache; and 8. That the deed purported to be a deed of Joseph, and was signed Batis Gamache ✕ his mark.

The foregoing facts fully justify the court, in their refusing such instruction as to the effect of both deeds; and as to the deed from Gamache, the only question was one of identity and fact for the jury; which reasons equally apply to the 8th, 9th and 10th instructions.

11. That the sale by the syndic of St. Cyr's property, was no evidence of his title to the lots, or that such sale was made. The first part of this instruction was given, and properly, for the reasons given in the first instruction; the latter part was properly refused, because the proceeding was a judicial one of record, which is, per se, evidence of the facts set forth, and cannot now be called in question. 8 Peters, 308, 310.

12, 13 and 16. These instructions depend on the facts of the case, and could not have been given without interfering with the province of the jury; the court charged favourably to the plaintiff in part of the 12th and 16th; that defendant had shown no title or bar to the plantiff under the act of limitation.

14, 15 and 17. These instructions were founded on the official

situation of the defendant before alluded to, and were properly refused under the decision of the court in the former case.

The 18th instruction is founded on the act of 1831, before noticed, which for the reasons heretofore given, could not avail the plaintiff; and he cannot complain of the refusal of the court to give it as asked; as they did instruct the jury, that no penal effect resulted from any act of congress, which bars or stands in the way of plaintiff's recovery, though it would have been good ground of an exception by the defendant, had a verdict been found against him.

The 19th, 20th and 21st instructions depended on the court assuming, that the facts relied on by the plaintiff were established by the evidence, and taking from the jury the right of deciding what facts were proved; the court were therefore right in refusing to instruct as requested. The instructions asked by the defendant, and given by the court, were founded on the evidence in the cause, relating to the possession of St. Cyr, and those claiming under him; and the consequent right of the defendant by prescription, as a bar to the plaintiff's right of recovery. We think they were fully justified by the evidence, especially with the qualifications laid down by the court, as to the nature of such possession, and of the title under which it was held, as appears in their further instruction to the jury. "That the possession mentioned must be an open and notorious possession, and that if they should find such possession, it gave title under, and according to the Spanish or civil law, which was in force in Upper Louisiana at the date of the treaty by which Louisiana was acquired by the United States, and remained in force and unabrogated by any law of the district of Louisiana or of Missouri, down to a period as late as October, 1818. That the possession of ten or thirty years would give a title, the one period or the other, according to the circumstances under which the possession was obtained. That the ten years' possession which would give a prescriptive title, must be a possession under a purchase made in good faith, and where the purchaser believed that the person of whom he purchased had a good title, and where the owner of the title prescribed against resided in the same country during the said ten years. That if the jury believe from the evidence, that the possession of St. Cyr, under whom the defendant claims, was obtained under a purchase made by him in good faith, and under the belief that the persons of whom he purchased had a good title, and that the possession of Choteau, under whom the defendant claims, was obtained in like manner and

under a purchase made with the like belief, and that they had the possession mentioned in the second instruction asked for on the part of the defendant, and that the said Marie Louise was in the country during the said ten years, the plaintiff cannot recover in this action.'"

And further instructed the jury, in relation to the possession mentioned in the third instruction asked for on the part of the defendant: "that to make the possession there mentioned a bar to the plaintiff's recovery in the present action, the possession of the defendant must have been obtained under a purchase, where he believed that the person of whom he purchased had a good title, and that the said Marie Louise was in the country during the said ten years; which, unless the jury believe, they cannot find for the defendant upon such possession.

These rules appear to be in conformity with the laws of Spain, as extracted from the books of established authority in Mr. White's Compilation, p. 68 to 71; and this Court has never laid down stricter or perhaps as strict ones, on questions of prescription, which they have decided according to the rules of the common law.

To the remaining instructions no exception appears to have been taken, and cannot, therefore, be considered: they were made the subject of a motion for a new trial, and are not cognizable in error.

The judgment of the court below is consequently affirmed, with costs.


Mr. Justice CATRON:

The plaintiff moved the court to instruct the jury as follows:—

1. That there is evidence before the jury of the possession and title of Rene Kiersereau, and Jno. B. Gamache, as absolute owners and proprietors of the two forty arpent lots described in the declaration.

That there is evidence before the jury of the possession and title of Louis Chancellier, as owner and proprietor of the two forty arpent lots in question, as assignee of said Rene Kiersereau, and said J. B. Gamache, respectively.

That there is evidence of the actual possession, after the death of said Louis Chancellier, by his widow, said Marie Louise, of said two forty arpent lots, claiming the same as absolute owner thereof.

That the plaintiff has established his title as assignee of Marie

Louise Chancellier, to the estate and interest vested in her and her heirs, in and to the two forty arpents in question.

That the deed given in evidence by plaintiff, from Auguste Gamache to Bazil Laroque and Marie Louise, his wife, enures to the benefit of the plaintiff.

That if the jury shall be of opinion, from the evidence, that Hyacinth St. Cyr originally obtained possession of the lots in question, as tenant of Marie Louise, the widow of Louis Chancellier, or by virtue of a permission to occupy and cultivate, given to said St. Cyr by the syndic of the village of St. Louis, the possession of St. Cyr so obtained shall be taken by the jury as in law the possession of said Marie Louise.

That the confirmations of the board of commissioners, on 23d July, 1810, of which the defendant was a member, could at most only operate as a quit claim by the United States in favour of the original grantees, and could not decide the question of derivative title under said original grantees.

That the mere fact of the land described in the confirmation to Choteau, and the land described in the confirmation given in evidence by the plaintiff, and the declaration, being identical, does not entitle the defendant to a verdict in his favour.

That no forfeiture or disqualification has accrued against Madame Marie Louise, the widow of Louis Chancellier or against her assigns, under any act of congress; whereby she or they are barred from asserting their legal and equitable rights to the lots in question before this court.

Which instructions were given by the court.

Instructions asked by the plaintiff, and partly refused by the court.

1st. That the sale and partition, and final decree, of which duly certified copies have been given in evidence by the plaintiff, establish the title of the widow of Louis Chancellier, Madame Marie Louise Deschamps, and her heirs, to the land described in said sale and partition, as sold and allotted to her; part of which said land consists of the two arpents by forty in the declaration described, bounded by Bisou, on the one side, and by J. B. Bequette, on the other.

2d. That independently of the title of Rene Kiersereau, and J. B. Gamache, there would be sufficient evidence before the jury to establish a title by prescription in Louis Chancellier and his heirs, and Marie Louise, his widow, and her heirs, to the two forty arpents described in the declaration.

3d. That Hyacinth St. Cyr took no title by prescription in and to said lots.

4th. That if the jury shall be of opinion that Hyacinth St. Cyr had notice of the sale of said lots to Marie Louise, by the proper Spanish authority, as given in evidence by the plaintiff, the possession of said Hyacinth St. Cyr of said arpents was not such as could be adverse to Marie Louise, or could create an estate by prescription in favour of said St. Cyr.

5th. That if the jury shall be of opinion, from the evidence, that St. Cyr was a purchaser at the public sale of the property of Louis Chancellier, or signed his name, or made his mark as purchaser on the margin of said sale; these facts are prima facie evidence that said St. Cyr had notice of the title of said Marie Louise, as purchaser at said sale of the lots therein described, as sold to her.

6th. That the deeds given in evidence by defendant to Rene Kiersereau, bearing date the 23d of October, 1793, conveyed nothing to St. Cyr; being made by a person out of possession, and whose conveyance for the same land to another person, to Chancellier, was upon record, and who therefore was guilty of the crime of "Estellionato," punishable by fine and banishment, by the Spanish law then in force.

7th. That the deed given in evidence by defendant from Joseph Gamache to Hyacinth St. Cyr, dated 23d October, 1793, is void on the ground of "Estellionato" in Batis Gamache, supposing that he made the deed; 2d, on the ground of uncertainty in the deed itself, in this, that it purports to be a deed of Joseph Gamache, and is signed Batis Gamáche ⋈ his mark.

8th. That Auguste Choteau took no estate by prescription in either of said forty arpent lots in question.

9th. That there is no evidence of possession whatever, adverse or otherwise, by Auguste Choteau, of said two forty arpent lots, or any part thereof.

10th. That if the jury shall be of opinion, from the evidence before them, that the said Auguste Choteau had notice of the public sale of said lots to Madame Marie Louise Chancellier, his possession or claim to said lots under Hyacinth St. Cyr is fraudulent and void as against said Marie Louise, and her heirs and assigns.

11th. That the certified copy of the proceedings and sale by the syndic, in the matter of Hyacinth St. Cyr, a bankrupt, is not evidence either of St. Cyr's title to either of the lots in question, or that

[Strother v. Lucas.]

same were sold by said syndic to said Auguste Choteau, as part of said St. Cyr's property.

12th. That the defendant has shown no title by prescription, under the Spanish or civil law, or by the statutes of limitation, (in bar of plaintiff,) under the Anglo American laws, to the lots in question.

13th. That the title of the defendant, as assignee of Auguste Choteau, is vitiated by the fraud which vitiates the title of Choteau and of St. Cyr.

14th. That the deed from Auguste Choteau and wife, to Lucas, of the lots in question, dated 11th January, 1808, is void for fraud; if, in opinion of jury, it was a sale and conveyance to Lucas of a claim and interest pending before said Lucas himself for adjudication.

15th. That if, in the opinion of the jury, the claim was pending before Lucas, as commissioner, when he bought it, the adjudication or confirmation of it on the 23d July, 1810, by the board of commissioners, of which Lucas was a member, is fraudulent and void at law and in equity.

16th. That neither the statute of limitations, nor the Spanish law of prescription, can avail the defendant, Lucas, independently of the possession of St. Cyr and Choteau:

17th. That the orders of survey given in evidence by the defendant, and made by himself and his two colleagues in favour of Auguste Choteau, bearing date June 10th, 1811, was fraudulent and void; if the jury shall be of opinion, from the evidence, that the claims therein ordered to be surveyed, had been sold to said defendant by said Choteau, previous to the date of said order; and while said claims were pending for adjudication before said defendant, as member of the board of commissioners in said order mentioned.

18th. That if any penal effect resulted from any act of congress, to Madame Chancellier and her assigns, or to the legal representatives of Rene Kiersereau and J. B. Gamache, the act of congress of January, 1831, entitled, "an act further supplemental to the act, entitled, an act making further provisions for settling the claims to lands in the territory of Missouri, passed the thirteenth day of June, one thousand eight hundred and twelve," remits the parties to their original and equitable rights and titles, as if no such penal act had ever been in force.

19th. That upon the case made by the plaintiff, he is entitled to a verdict for all that part of the two forty arpent lots in question, situ-

ated west of Seventh street, in St. Louis, and all the lots east of Seventh street, according to the admissions of defendant as above.

20th. That in this case there is no law or binding ordinance of the Spanish government, by which Madame Chancellier, and those claiming under her, could be deprived, according to the state of the evidence in this case, of whatever title she acquired to the land in question, under the purchase made of it by her as the property of her husband.

21st. That if the jury believes, from the evidence, that St. Cyr ceased to cultivate and be in actual possession of the premises in dispute, from 1797, or 1798, prescription ceased to run in his favour, and that of those who claim under him from that time.

Which instructions the court refused to give; but instructed the jury in relation to the matter referred to in the first instruction above refused: "that the sale, and partition, and final decree, the record of which certified copies have been given in evidence by the plaintiff, did pass the title of Louis Chancellier, mentioned in said proceedings of sale, such as it was at the time of his death, or such as it was in his heirs at the time of said sale to Madame Marie Louise, his widow, mentioned in said proceedings, and her heirs, to the lands described in said record of sale and partition, as sold and allotted to her.

And further instructed the jury, in relation to the matters mentioned in the fifth instruction above refused: "that if the jury should be of opinion that St. Cyr, under whom the defendant claims, was a purchaser at said public sale of the property of said Louis Chancellier, or did sign his name or make his mark on the margin of the record of said sale: these facts, or either of them, is evidence proper for them to consider in ascertaining whether said St. Cyr had notice of the said title of said Marie Louise, as purchaser at the said sale of the lots described in the record thereof as sold to her."

And further instructed the jury, in relation to the matters referred to in the eleventh instruction above refused: "that the certified copy of the proceedings and sale by the syndic, of the property and estate of St. Cyr as a bankrupt, was not evidence of a title to said St. Cyr to the lots in question, or either of them."

And further instructed the jury, in relation to the matters referred to in the twelfth instruction above refused, and to the statutes of limitation referred to in that refused instruction: "that the defendant

had shown no title to the lots in question, nor any bar to the plaintiff's recovery under any statute or statutes of limitation."

And further instructed the jury, in relation to the matters referred to in the sixteenth instruction above refused: "that the statute of limitations could not avail the defendant, Lucas, either with or independent of the possession, of St. Cyr."

And further instructed the jury, in relation to the matters referred to in the eighteenth instruction above refused: "that although the act of congress of the 31st of January, 1831, referred to in said refused instruction last mentioned, does not remit the penalties as in that refused instruction is supposed by the plaintiff; yet, that in fact no penal effect results from any act of congress which bars or stands in the way of plaintiff's recovery in the present action; or which in any manner affects his title or evidence of title, under, or to be derived from said acts, or any of them, under the admissions of the parties in the present case."

The first instruction refused, could not be given in the form it was asked, because it would have concluded the cause as to *fact* and law. The explanations given by the court were proper.

The second and third asked the court to pronounce on the facts.

The fourth asked the court to declare, that if St. Cyr had notice of Madame Chancellier's purchase, his title could not be confirmed by prescription. St. Cyr, and those claiming under him, could have prescribed notwithstanding such knowledge, had the possession been continued a sufficient length of time. On this point, the charge of the district judge, in response to the instructions asked by the defendant, is substantially accurate.

The explanation of the fifth instruction asked, is highly favourable to the plaintiff.

The sixth asked the court to instruct the jury that Kiersereau was not in possession when he made the deed; and therefore it was void. If St. Cyr was *in lawful* possession for himself, no forfeiture could follow by the conveyance to him; and this depended on the *fact*, whether St. Cyr was lawfully in possession. How the civil law was, in 1793, in cases of conveyances, where the lands were claimed and holden in actual possession, adversely to the grantor and grantee at the time the deed was made; is immaterial, and is not decided.

The seventh, eighth and ninth instructions asked, propose to refer to the court for decision, questions of fact, pertaining to the jury.

The tenth assumes that Choteau's possession was void, if he had notice of the sale to Madame Chancellier. This by no means follows. He might have possessed in good faith, notwithstanding; of which the jury were to judge. But if the possession was in bad faith, still its continuance for thirty years by Choteau and those from whom he derived it, and the subsequent continuance thereof by Lucas, would have authorized the prescription.

The eleventh and twelfth instructions asked were given; and the thirteenth asked the court to charge on the fact, and to declare to the jury there was fraud: a principal matter they were called on to try.

The fourteenth, fifteenth and seventeenth instructions are the same that were in the cause previously before this Court; when it was decided, that Lucas could purchase under the circumstances indicated. The point is not deemed open to investigation: such is the opinion of my brethren who decided that cause, and with which I concur.

The sixteenth asks a charge on the fact, how Lucas held possession, and the length of its continuance; and was properly refused.

The eighteenth was correctly explained by the district court.

The nineteenth proposes, in effect, that the cause be decided by the court. Had the instruction been given, it would have withdrawn from the jury the determination of the facts.

To the twentieth, it may be answered, that by the laws of Spain, Madame Chancellier's title might have been prescribed against.

The twenty-first is correctly answered by the district court. The judge said to the jury: "That if they should find from the evidence that said St. Cyr took possession, or was in possession of the lands in controversy, or any of them, under said Marie Louise, or as her tenant, his possession so taken or held would be the possession of the said Marie Louise; and would not be a possession in St. Cyr, available by him or those claiming under him, under the law of prescription mentioned. But, that if the jury should be of opinion, that said St. Cyr came to the possession of the land in controversy, not as the tenant of the said Marie Louise, or under her, but under a claim and title adverse to her; such adverse claim and possession would constitute a possession upon which a prescription, by the Spanish or civil law referred to and then in force, would begin to run in favour of him, and those claiming under him, if such possession was actual, open, and notorious; and that such possession so commenced,

[Strother v. Lucas.]

would constitute and preserve to said St. Cyr, his heirs or assigns, a possession available under the law of prescription referred to; notwithstanding said St. Cyr, or those deriving title from him, should leave the actual possession or cease to occupy, and cultivate, if that abandonment of the actual possession, occupancy, or cultivation was with the intention to return, and without any mental abandonment of the possession."

Instructions asked by defendant, and given by the court:

1st. "That if the jury find from the evidence that Hyacinth St. Cyr, and those lawfully claiming under him, have possessed the two arpents by forty, surveyed for Gamache and Kiersereau, without interruption, and with claim of title for thirty years, consecutively, prior to October, 1818, the plaintiff is not entitled to recover in this action.

2d. "If the jury find from the evidence that Hyacinth St. Cyr, and those lawfully claiming under him, possessed the two lots in the declaration mentioned, for ten years, consecutively, prior to, and until the 23d day of July, 1810, and the lands confirmed to Auguste Choteau on that day, are the same lands in the declaration mentioned; the plaintiff cannot recover in this action.

3d. "If the jury find from the evidence that the defendant possessed the lots of land in the declaration mentioned for ten years, consecutively, prior to the first of October, 1818, the plaintiff cannot recover in this action."

Which instructions the court gave to the jury; with the further instruction: "That the possession mentioned must be an open and notorious possession; and that if they should find such possession, it gave title, under, and according to the Spanish or civil law, which was in force in Upper Louisiana at the date of the treaty, by which Louisiana was acquired by the United States; and remained in force and unabrogated by any law of the district of Louisiana or of Missouri, down to a period as late as October, 1818. That the possession of ten or thirty years would give a title, the one period or the other according to the circumstances under which the possession was obtained. That the ten years' possession which would give a prescriptive title, must be a possession under a purchase made in good faith; and where the purchaser believed that the person of whom he purchased had a good title; and where the owner of the title prescribed against resided in the same country during the said ten years. That if the jury believe from the evidence, that the possession of St. Cyr,

[Strother v. Lucas.]

under whom the defendant claims, was obtained under a purchase made by him in good faith, and under the belief that the persons of whom he purchased had a good title; and that the possession of Choteau, under whom the defendant claims, was obtained in like manner and under a purchase made with the like belief; and that they had the possession mentioned in the second instruction asked for on the part of the defendant; and that the said Marie Louise was in the country during the said ten years, the plaintiff cannot recover in this action."

And further instructed the jury, in relation to the possession mentioned in the third instruction asked for on the part of the defendant: "that to make the possession there mentioned a bar to the plaintiff's recovery in the present action, the possession of the defendant must have been obtained under a purchase, where he believed that the persons of whom he purchased had a good title, and that the said Marie Louise was in the country during the said ten years; which, unless the jury believe, they cannot find for the defendant upon such possession."

The foregoing instructions given for the defendant, with the explanations, are substantially correct.

This is the whole case; in the affirmance of the judgment in which, I concur, for the reasons here stated. But there are various principles introduced into the preceding opinion, the accuracy of which I very much doubt. Furthermore: it is apprehended they are foreign to the case presented by the record; and it is feared their introduction into it, may lend them a sanction they do not deserve, and embarrass the inferior courts, and this Court, in future, in the numerous controversies now depending, and likely to arise on the titles of Florida, Louisiana, Missouri, Arkansas and Wisconsin, involving the application and construction of the laws of France and Spain: and hence this separate opinion has been filed.

Mr. Justice WAYNE stated that he dissented from the opinion of the Court, delivered by Mr. Justice Baldwin. He was authorized to say that Mr. Justice M'Kinley concurred with him in opinion.

The title to the lots was in Chancellier at the time of his death. St. Cyr obtained a title by fraud, and by fraud he continued in possession.

Choteau's claim is not such as divested the title of Chancellier, according to the Spanish law.

[Strother v. Lucas.]

Mr. Justice M'LEAN dissented.

Mr. Chief Justice TANEY did not sit in this cause, having been of counsel for one of the parties.

This cause came on to be heard on the transcript of the record from the district court of the United States for the district of Missouri; and was argued by counsel. On consideration whereof, it is now here adjudged and ordered by this Court, that the judgment of the said district court in this cause be, and the same is hereby affirmed, with costs.